**In re Mary PINTO, Individually, and Joseph Pinto, Individually and Trading as East Coast Produce, Debtors.**

**Mary PINTO, Individually, and Joseph Pinto, Individually and trading as East Coast Produce, Plaintiffs,**

**v.**

**PHILADELPHIA FRESH FOOD TERMINAL CORPORATION, Defendant.**

**Bankruptcy No. 87–02493S.
Adv. No. 87–1077S.**

United States Bankruptcy Court, E.D. Pennsylvania.

March 30, 1989.

Michael D. Power, Janet M. Sonnenfeld, Philadelphia, Pa., for debtors.

Louis DiGiacomo, Philadelphia, Pa., for defendant.

Anthony R. Barone, Philadelphia, Pa., Interim Trustee.

James J. O'Connell, Philadelphia, Pa. Asst. U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### INTRODUCTION

Before us is the latest chapter in an adversarial proceeding involving the application of § 548 of the Bankruptcy Code to the termination of a lease at the Defendant food terminal and elimination of the value of the Debtors' stock in the Defendant. In an earlier Opinion issued in this matter, we concluded that the Defendant's actions effected a transfer of an interest of the Debtors for less than a reasonably equivalent value. *In re Pinto*, 89 B.R. 486 (Bankr.E. D.Pa.1988). However, we concluded that the Debtors had failed to establish that the transfer qualified as avoidable under § 548(a)(2), since they had failed to establish that they were either insolvent at the time of the transfer or rendered insolvent as a result of the transfer. *Id.* at 500–501. Upon the Debtors' post-trial motions, we re-opened this matter and may now assess the solvency of the Debtors at the time of the transfer upon a full record. Applying the Code's "balance sheet" test of insolvency, we find that, at the time of the transfer, the Debtors' liabilities greatly exceeded their non-exempt assets. As a result, we find that the Debtors were insolvent and have now established all of the requisite elements for avoidance of the transfer in issue as constructively fraudulent under 11 U.S.C. § 548(a)(2).

The Debtors pleaded, in their Amended Complaint, a cause of action on the basis of unjust enrichment. *Id.* at 502. However, we agree with the Defendant that this theory of recovery was never developed by the Debtors either at trial or in their post-trial submissions. Accordingly, we shall dismiss this Count of the Debtors' Amended Complaint.[1]

PROCEDURAL HISTORY

The Debtors, MARY PINTO and JOSEPH PINTO, SR. (herein "the Debtors"), individually and trading as East Coast Produce (hereinafter "ECP"), filed the present adversary action against the PHILADELPHIA FRESH FOOD TERMINAL CORPORATION (herein "the Defendant"), seeking compensatory and punitive damages for the allegedly fraudulent transfer of the Debtors' interests in a lease from the Defendant and twenty shares of the Defendant's stock. Hearings were originally held in this proceeding on April 12 and 29, 1988, and we issued an Opinion in this matter on August 11, 1988. *Pinto, supra.* In that Opinion we concluded that § 548 of the Bankruptcy Code did apply to the Defendant's actions. However, we concluded that the Debtors had failed to establish the elements of a fraudulent transfer under either § 548(a)(1) or § 548(a)(2) of that Code Section. With respect to § 548(a)(2), our conclusion was due solely to the Debtors' failure to establish that they met any of the three alternative requirements of § 548(a)(2)(B). 89 B.R. at 500–501. In addition, we refused to consider the Debtors' suggestion, raised for the first time in their post-trial submission, that the Defendant was unjustly enriched as a result of its actions, since this theory of recovery had not been raised in the pleadings. *Id.* at 502.

After issuance of the initial Opinion in this matter, the Debtors, undoubtedly motivated by our observations in that Opinion, sought to amend their pleadings by filing a Motion to Amend Pleadings and Court Findings and a Motion for a New Trial and to Amend Court Findings. A hearing on these Motions was held on September 28, 1988. By Order entered September 29, 1988, we granted the Debtors' Motions in part, reopening the record in this matter and giving the Debtors until October 11, 1988, to file an Amended Complaint setting forth any new legal theories. By that same Order, we gave the Defendant an opportunity to amend its answer; allowed the parties until November 25, 1988, to complete any additional discovery; and set a date for a supplemental trial, at which we assured the Defendant that it could attempt to mend any flaws in its case, on December 6, 1988.

By error, our Order of September 29, 1988, was misdirected. As a result, we granted the Debtors an extension of time until October 19, 1988, within which to file their amended pleading. The Debtors' Amended Complaint for Fraudulent Conveyance and Unjust Enrichment was filed on October 19, 1988, and the Defendant's Amended Answer was timely filed on October 31, 1988. Included in the Defendant's pleading was a Counterclaim seeking rental payments from the Debtors for the period between November 1, 1986, and June 30, 1987, including late charges and reimbursement for use and occupancy taxes. The Debtors' Answer to this Counterclaim was filed on November 14, 1988.

The supplemental trial in this matter was conducted on December 6, 1988, as scheduled. The Debtors recalled Joseph Pinto, Jr. (hereinafter "Pinto, Jr.") and Mary Pinto (hereinafter "Mary") to testify regarding the assets and liabilities of ECP and the individual Debtors. While Joseph Pinto, Sr. (hereinafter "Pinto, Sr.") was also called to testify, his testimony was brief and not very helpful. As a result of a stoke that he had suffered in August, 1986, it was clear that he had little recollection of

---

1. In any event, we doubt that the Debtors could have recovered on the basis of unjust enrichment where, as here, the parties' relationship was based on a written contract. *See, e.g., Efco Importers v. Halsobrunn,* 500 F.Supp. 152, 157 (E.D.Pa.1980); *In re Summit Airlines, Inc.,* 94 B.R. 367, 370 (Bankr.E.D.Pa.1988); *Schott v. Westinghouse Electric Corp.,* 436 Pa. 279, 290–92, 259 A.2d 443, 448–49 (1969); and *Roman Mosaic & Tile Co., Inc. v. Vollrath,* 226 Pa.Super. 215, 217, 313 A.2d 305, 307 (1973).

the relevant facts. The Defendant called Michael Piccolo (hereinafter "Piccolo"), a real estate broker, to testify regarding the value of the Debtors' residence. In addition, the Defendant recalled Raymond Farber (hereinafter "Farber"), its general manager.

A transcript of the trial was ordered and was filed on January 23, 1989. On January 24, 1989, we entered an Order requiring that the parties file their Supplemental Proposed Findings of Fact and Conclusions of Law by February 8, 1989 (Debtors), and February 23, 1989 (Defendant). The parties' post-trial submissions were timely filed.

We have already made extensive Findings of Fact and Conclusions of Law in this matter, which are set forth in our previous decision, 89 B.R. at 489–502. We will not restate those here, as we have concluded that there is no basis for reconsideration of any of them. However, we will supplement same based upon the new evidence and arguments presented at the supplemental trial and in the post-trial submissions. We render our decision in the form of Findings of Fact and Conclusions of Law as required by Bankruptcy Rule (hereinafter "B.Rule") 7052 and Federal Rule of Civil Procedure 52(a).

FINDINGS OF FACT

1. As of November 11, 1986, which we previously determined and reaffirm was the date of the transfer in issue, 89 B.R. at 496–97, the Debtors owned a home located at 2129 Porter Street in the Girard Estate section of south Philadelphia, Pennsylvania, in which they had resided for years.

2. The Debtors' home was sold on November 14, 1988, for $112,000.00. However, the proceeds from this sale were exhausted by satisfaction of mortgages against the property and other expenses associated with the sale. None of the proceeds from this sale were paid to the Debtors.

3. The Debtors' home had originally been listed for sale for $139,900.00. However, the only other offer made for the property was for $107,000.00.

4. Piccolo testified that the value of the property in November, 1986, was in the range of $140,000.00. Piccolo attributed the alleged decline in value over the two-year period prior to the sale to city-wide increases in transfer, business use, and occupancy taxes which occurred between 1986 and 1988, and to the low supply of homes available for sale in the Girard Estate area in 1986.

5. Piccolo also testified that he checked the sale prices of several comparable properties located near the Debtors' residence that were sold in 1986. According to Piccolo, the sale price of these properties ranged from $106,000.00 to $160,000.00. However, the higher priced properties did not appear to be comparable to the Debtors' residence, since they were larger or possessed additional amenities. For example, he referenced a property that sold for $160,000.00 that was a larger home containing apartments. Another property referenced, which was sold for $155,000.00, was located on a corner lot. The additional properties which Piccolo used as comparables had sold for $120,000.00, $122,000.00, and $130,-000.00.

6. Piccolo testified that, on a city-wide basis, real estate had appreciated at a rate of seven (7%) percent to eight (8%) percent *per year* between 1986 and 1988, which appears inconsistent with his contention that city-wide increases were the cause for the decline in the value of the Debtors' property. Equally paradoxically, he contended that values in the Girard Estates section as a whole did not depreciate during the relevant period.

7. Mary, displaying an overly-generous objectivity which suggested that she was ignorant of the legal ramifications of her testimony, concurred with Piccolo's opinion that the property in her neighborhood had declined.[2] We found this testimony, however, uninformed and of little assistance.

2. In general, Mary's testimony regarding the value of the Debtors' assets was reminiscent of that of the debtors in *In re Corbett,* 80 B.R. 32,

37 (Bankr.E.D.Pa.1987). Apparently believing that it would further their cause, the Corbetts greatly exaggerated the value of their assets.

8. While the value of the Debtors' property may have declined somewhat between the period of November, 1986, and November, 1988, we believe that Piccolo's estimate of the property's value in 1986 to be inflated. The comparability of the other properties cited by Piccolo is questionable in light of the additional features which they offered. The real estate values for Philadelphia in general had *appreciated* rather than depreciated over this period even though the increases in transfer, business use, and occupancy taxes, which allegedly impacted this property, were city-wide. In consideration of these facts, together with the lower offers actually made for the property when it was actually listed for sale, we believe that Piccolo's estimation of the value of the property in 1986 is too high. We find that the value of the property, as of November 11, 1986, was $124,000.00, which is about the mid-range of the comparables examined by Piccolo.

9. On November 11, 1986, the Debtors' owned a 1982 Plymouth automobile which they valued at $3,500.00 in their Schedules. This valuation appears, if anything, too generous.

10. In addition, the Debtors owned household furniture, appliances, clothing, and some paintings. The aggregate value given to this property in the Debtors' schedules was $3,000.00. However, Mary, making no effort whatsoever to deflate her estimates, *see* Finding of Fact 7 & n. 1, page 204 *supra,* testified that only the following property was worth more than $200.00: refrigerator—$700.00; dining room set—$300.00 to $400.00; and living room furniture—$300.00 to $400.00.

11. Mary also stated that she owned a diamond ring worth $1,000.00 and a number of gold bracelets worth an additional $1,000.00.

12. Mary further testified that the Debtors held two life insurance policies in the face amount of $500.00 and $5,000.00, respectively, but that she did not know the cash surrender value of these policies. It is unclear whether the $5,000.00 policy was even in existence on November 11, 1986, in light of her testimony that this policy was purchased some time in the last two years.

13. The Debtors' Schedules list bank deposits in the amount of $200.00 and cash on hand in the amount of $150.00. There was no evidence or argument presented to suggest that the Debtors' cash on hand or deposits on November 11, 1986, exceeded these amounts.

14. Pinto, Sr., as was evident at trial, was severely disabled as the result of a stroke suffered in early August, 1986, and thereafter discontinued the business of ECP. The only income that was available to the Debtors thereafter was Social Security benefits which presently total $970.00 per month. Since this figure includes cost-of-living increases granted since November 11, 1986, the benefits paid to the Debtors on that date were probably somewhat less than what they presently receive.

15. In or about September, 1986, Battaglia Produce Sales, Inc., filed an action in the Philadelphia Court of Common Pleas against Pinto, Jr., and Pinto, Sr., individually and trading as ECP. A default judgment was taken in this case and an Order was issued on October 29, 1986, appointing Herman Mattleman, Esquire, receiver for ECP and ordering Pinto, Sr. to convey the business and its assets to the receiver.

16. Entered into evidence as Exhibit P–50 was a report entitled "Accounts Receivable Schedule—East Coast Produce—6/30/86," which was identified by Pinto, Jr. as a business record of the company. This report indicates that, as of June 30, 1986, the total of the accounts receivable of the business was $42,196.44. This figure represents $37,198.69 arising in June, 1986, and $4,997.75 arising prior thereto.

17. The Defendants maintain that the accounts receivable of ECP were worth $301,232.27 on November 11, 1986. In support of their position, they submitted, as

Similarly, here it appeared that Mary was totally oblivious to the legal significance of her testimony regarding the value of the Debtors' assets and, as a result, was completely forthright and believable in her answers.

Exhibit D–54, thirty-one (31) ledger sheets which the Defendant maintains reflect the accounts receivable of ECP from July 7, 1986, through July 27, 1986. According to this record, the balance of the accounts receivable at the beginning of the period was $295,192.17; during the period an additional $47,831.00 in debits was made, $49,512.85 in payments were received, and adjustments in the amount of $7,721.95 were credited to the accounts, leaving a balance of $301,232.27 as of July 27, 1986. However, no witness was able to identify this record as a business record from ECP and the document itself does not appear to contain any information which identifies its author or origin. As a result, we do not believe that we can properly rely on the accuracy of the figures contained therein.

18. Most of the balance of the $301,232.27 reflected on D–54 is derived from a previous balance of $295,192.17 carried forward from the beginning of July, 1986. However, this figure is contradicted by another document of record (Exhibit P–50), which shows an accounts receivable balance at the end of June, 1986, in the amount of $6,306.94. There is no explanation from any source regarding how the $295,192.17 was calculated or how a company that was then only three months old could have accumulated such a large balance of accounts receivable. It is likely that this figure carried over very old accounts in existence when Pinto, Jr. owned the business. We believe that the $6,306.94 balance reflected in P–50 is more likely to be an accurate reflection of the accounts receivable balance of the business at the end of June, 1986, than the previous balance from July, 1986, on D–54.

19. Even if we were to assume that Exhibit D–54 accurately reflected the accounts receivable activity of ECP for the month of July, 1986, it would be of no avail to the Defendant unless we also assumed that the balance at the beginning of that month was $295,192.17. For the reasons stated above, we are unable to accept that assertion as fact. Assuming a balance of $6,306.94 at the beginning of July, as reflected in P–50, and assuming that D–54 accurately reflects the accounts receivable

activity for July, 1986, the balance at the conclusion of July would have been $12,347.04 and not $301,232.27 [previous balance ($6,306.94) + debits ($47,831.00) + adjustments ($7,721.95) − payments ($49,512.85) = $12,347.04].

20. The terms of payment for produce purchased at the terminal are one week, but purchasers generally pay within two to three weeks of purchase.

21. The Defendants maintain that ECP's accounts receivable were all collectible. Farber testified that the merchants who purchased produce from ECP were credit-worthy and that he would have known if they were not paying their bills. However, Pinto, Jr. testified that ECP received only a few payments on their accounts receivable after the company ceased operations in August, 1986. In addition, Pinto, Jr. indicated that the outstanding accounts had been referred to an attorney for collection but his efforts were unsuccessful.

22. We believe that the most persuasive evidence offered on the collectability of ECP's accounts receivable was the testimony of Marvin Levin, Esquire (hereinafter "Levin"). Levin was the attorney for the state court receiver, Mr. Mattleman, who had been appointed on October 19, 1986. Levin was called *by the Defendant* as its witness at the first hearing held in this matter on April 12, 1988. At that time, Levin testified that, despite his best efforts pursuant to his fiduciary duty to the business, he was unable to collect any of the accounts receivable for ECP. He additionally testified that he was unable to attach any bank accounts for ECP and that, after the appointment of the receiver, the business had no assets that could have been used to pay rent to the Defendant. In light of this testimony, we find that any accounts receivable that were still outstanding on November 11, 1986, were uncollectible and, as a result, cannot be considered as an asset available to the Debtors in determining their solvency as of that date.

23. The Defendant's position that the accounts receivable were collectible and

were generally paid within two to three weeks does little to advance its position here. ECP ceased business in early August, 1986. If, in fact, all of the accounts receivable were collectible and were paid within two to three weeks, there would have been no balance outstanding on these accounts on the relevant date in question, *i.e.*, November 11, 1986. Conversely, if a balance of $301,323.27 was still outstanding in November, 1986, these accounts would be, at that juncture, *over three months old*, indicating that these merchants were *not* paying their bills on time and that these accounts were not collectible. As a result, we find that if, in fact, any accounts receivable of ECP were still outstanding as of November 11, 1986, the balance of accounts was considerably less than the $301,232.27 figure cited by the Defendant.

24. The only business equipment owned by ECP as of November 11, 1986, was three trailers and a few electric jacks used by ECP in their operations. Pinto, Jr. testified that trailers were welded to the back of ECP's store at the terminal and could not be driven away. Farber admitted at April 29, 1988, hearing that the trailers had been removed when the premises were re-let and that they were presently worthless. The Debtors' Schedule B–2 states the value of their office equipment as "nominal, if any." In the absence of any contrary evidence, we ascribe no value to these "assets."

25. Farber testified at the April 29, 1988, hearing that, during the time that he had worked with the Defendant, he was not aware of anyone who had purchased the Defendant's stock independently from leasing a unit at its terminal.

26. As detailed in our previous Opinion, 89 B.R. at 490, 492, the Defendant and Pinto, Sr. entered into an agreement restricting the transfer of the Defendant's stock by Pinto, Sr. on April 10, 1986. The Defendant offered to pay the $8,400.00 calculated pursuant to the formula set forth in this agreement to repurchase the Debtor's twenty (20) shares of Defendant's stock. The Defendant continues to be willing to pay this amount for the stock.

■ 27. The Debtors' Statement of Financial Affairs and Schedules were admitted into evidence in this case. It is clear from a review of the Statement of Financial Affairs and Schedules that the Debtors had considerable indebtedness at the time of filing their bankruptcy case. The Debtors' Schedule A–3 lists the total amount of their unsecured non-priority debts as $275,941.92. Included among this list are utility and credit card bills, in addition to ECP's accounts payable. Schedules A–3 and A–4 (priority claims) recite an additional twenty-one (21) creditors, the amount of whose claims is listed as unknown. In addition, the Debtors' Statement of Financial Affairs lists four (4) lawsuits and seven (7) complaints brought against either Pinto, Sr. or ECP before the United States Secretary of Agriculture pursuant to the Perishable Agricultural Commodities Act of 1930.

28. While the Debtors' Statement and Schedules were not filed until August 5, 1988, the claims listed there should reflect and appear to reflect the Debtors' situation at the time that their bankruptcy case was filed, on May 21, 1987. We find that evidence of liabilities in existence in May, 1987, is probative on the issue of liabilities in existence six months prior to that time, November 11, 1986.

29. On November 11, 1986, Frankfort Trust Company held both a mortgage and a note executed by the debtors. The parties have stipulated that the aggregate value of these two obligations, with interest, on November 11, 1986 was $96,294.13.

30. A second mortgage on the Debtors' home was held by Prudential Savings Association and was executed in 1982. Pinto, Jr. testified that, when his parents' property was sold, Prudential was paid $27,000 on this obligation, but that the balance in November, 1986, was between $18,500 and $22,000. This obligation was listed at $25,000 on the Debtors' Schedule A–2. We adopt the lowest of the figures ascribed to this obligation, *i.e.*, $18,500.

31. Pinto, Sr. was personally liable for the business debts of ECP since he was

operating the business as a sole proprietorship.

32. Business records from ECP indicate that its accounts payable outstanding were $195,194.18, as of June 30, 1986, and $237,805.76 as of July 25, 1986. In addition, these records contain notations reflecting additional accounts payable incurred between July 25, 1986, and August 1, 1986, and a balance of $260,264.94 on August 1, 1986.

33. The Debtors' Schedule A–3 includes many of the accounts payable listed in ECP's records. In fact, twenty (20) of the creditors listed in ECP's records are also listed in the Debtor's Schedule A–3. According to the records, the total amount of the accounts payable owed to these twenty (20) creditors on August 1, 1986, was $250,619.05.

34. The Defendant presented two financial reports of ECP prepared by certified public accountants which purported to reflect the financial condition of the Debtors as of February, 1986, and March, 1986, respectively. These reports were submitted to the Defendant by Pinto, Sr. when he was requesting the Defendant's approval of his purchase of its stock from his son and a lease of his son's unit at the terminal. Letters covering both reports indicate that the reports were based principally on information provided by the Debtors and disclaim any opinion or assurances as to the accuracy of the information disclosed. Pinto, Jr. testified that he had, in fact, provided the data included in these reports. He admitted that he had provided false information for these reports so that his parents' financial situation would appear better than it actually was, in order to induce the Defendant to approve the sale of his stock and the lease of a unit to his father.

■ 35. Admitted into evidence at the December 6, 1988, hearing were the twenty-three (23) proofs of claims filed against the Debtors in their bankruptcy case, which total $334,245.73. In addition to the mortgages and accounts payable already discussed above, the following claims appear to have been in existence on the relevant date of November 11, 1986: [3]

| Claim No. | Creditor | Amount |
|---|---|---|
| #2 | Commonwealth of Pennsylvania Department of Revenue | $ 452.00 |
| #4 | Philadelphia Electric Co. | 17.63 |
| #7 | Bell Telephone Company of Pennsylvania | 722.86 |
| #9 | Charles F. Zambito | 41,009.69 |
| #11 | Maillie Falconiero & Co. | 4,867.00 |
| #12 | Pennsylvania Office of Employment Security | 1,391.34 |

3. We agree with the Defendant that it appears that a number of the proofs of claim may not in fact be legitimate obligations of the Debtors. For example, Claim No. 1, filed by Battaglia Sales Inc. is based on a Default Order entered on April 16, 1986 against Joe Pinto & Son. Claim No. 6 filed by Provident National Bank, is based on an Installment Loan Note entered into by "Stanley Sussman & Joe Pinto, Partnership." It was Pinto *Jr.* and not Pinto Sr. who was in partnership with Stanley Sussman. See Finding of Fact No. 8 in the previous Opinion, 89 B.R. at 490. Both Proof of Claim No. 16, filed by Grimmway Farms, and No. 20, filed by Phelan & Taylor Produce Co., are for produce delivered to Joe Pinto & Son prior to the sale of assets from Pinto, Jr. to Pinto, Sr. in April, 1986. As noted by the Defendant, this Agreement provided for the sale of assets only, and did not render Pinto, Sr. liable for the prior debts of his son. Accordingly, we have not included these obligations in our calculation of the solvency of the Debtors here. See 2 COLLIER ON BANKRUPTCY, § 101.31[5], at 101–96 (15th ed. 1989) (question of inclusion of a liability in a determination of solvency will depend on whether a claim constitutes a valid debt under applicable state or federal law). However, the term "debt" is defined by the Code as liability on a claim. 11 U.S.C. § 101(11). Claims have been filed in this case for each of the above-mentioned obligations. It appears that no objections have been filed to these, or any other, proofs of claim. Absent any objection to them, these claims will be allowed. *See, e.g., In re Lewis,* 80 B.R. 39, 40 (Bankr.E.D.Pa.1987) (Scenario 1). Therefore, all of the claims filed may be considered as liabilities of the Debtors. *See* 11 U.S.C. § 502(a).

| Claim No. | Creditor | Amount |
|---|---|---|
| #15 | Internal Revenue Service | $ 7,036.50 |
| #17 | Marvin H. Levin, Esq. | 2,000.00 |
| #18 | Herman Mattleman, Esq. | 3,000.00 |
| #19 | Stanley E. Gever, Esq. | 2,000.00 |
| #22 | Fred S. James & Co., Inc. of Pa.[4] | 5,134.04 |
| #23 | City of Philadelphia | 874.78 |
| | TOTAL | $68,505.84 |

CONCLUSIONS OF LAW

I. THE DEBTORS HAVE ESTABLISHED THAT THEY WERE RENDERED INSOLVENT AS A RESULT OF THE DEFENDANT'S TERMINATION OF PINTO, SR.'S LEASE AND EXERCISE OF ITS OPTION TO PURCHASE ITS TWENTY SHARES OF STOCK

■ As noted in our initial decision in this matter, in order to avoid the transfer of their interests effected on November 11, 1986, pursuant to § 548(a)(2)(B)(i) of the Bankruptcy Code, the Debtors must establish both that they received less than reasonably equivalent value for the transfer and that the Debtors were either insolvent on the date of the transfer or were rendered insolvent as a result of the transfer. 89 B.R. at 500. We noted, in a decision subsequent to our original Opinion in this case, *In re Pinto Trucking Service, Inc.*, 93 B.R. 379, 388 (Bankr.E.D.Pa.1988), that persuasive authority exists for the conclusion, that, having established that the transfers in issue were made for less than adequate consideration, the burden of proving *solvency* may switch to the Defendant. *See United States v. Gleneagles Investment Co.*, 565 F.Supp. 556, 577 (M.D.Pa. 1983), *aff'd sub nom. United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir.), *cert. denied sub nom. McClellan Realty Corp. v. United States*, 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987); and *Baker v. Geist*, 457 Pa. 73, 78, 321 A.2d 634, 637 (1974). However, consistently with our prior decision in this case, 89

B.R. at 501–02, and the doctrine of "the law of the case," *see In re Cole*, 89 B.R. 433, 436 (Bankr.E.D.Pa.1988), we will assume that, on the issue of solvency, it is necessary that the *Debtors* establish that they are *insolvent* in order to prevail on this issue.[5]

Insolvency is defined by the Bankruptcy Code, at 11 U.S.C. § 101(31), as follows:

(A) with reference to an entity other than a partnership, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—

(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

(ii) property that may be exempted from property of the estate under section 522 of this title; ...

*See Corbett, supra*, 80 B.R. at 37–38. As we noted in *In re Art Shirt, Ltd.*, 68 B.R. 316, 322 (Bankr.E.D.Pa.1986), *aff'd*, 93 B.R. 33 (E.D.Pa.1988), the Code requires the use of a "balance sheet" test for insolvency. Thus, a debtor will be considered to be insolvent where "the debts of such entity are greater than its assets, at fair valuation, exclusive of property exempted under section 522 or fraudulently transferred." 2 COLLIER, *supra*, ¶ 101.31[1], at 101–74. *Compare Tabor Court Realty, supra*, 803 F.2d at 1303; and *In re Fleet*, 89 B.R. 420, 424–25 (E.D.Pa.1988) (addressing the broader, common-law test for insolvency).

We note, preliminarily, that it was by letter dated November 11, 1986, that the Defendant advised Pinto, Sr. that it was

---

4. We note, as does the Defendant, that this proof of claim is for insurance policies in effect between August 20, 1985, through September 20, 1986. The total amount of this claim was $13,-348.50. Since ECP was only in operation for five (5) out of these thirteen (13) months, we

only consider the costs for these policies pro-rated over five (5) months.

5. Had we followed *Tabor Court* and *Baker* on this issue in our original Opinion, we would have ruled in favor of the Debtors at that time.

terminating his lease to Unit 110 at its terminal and exercising its option to purchase his twenty (20) shares of the Defendant's stock. *Pinto,* 89 B.R. at 492. Prior to this time, Pinto, Sr. held an interest in his lease and the twenty shares of Defendant's stock which was worth between $75,000.00 to $150,000.00. *Id.* at 500. However, the Defendant, by terminating the lease; exercising its option to repurchase the twenty shares of its stock; and then issuing new stock and selling the stock and a lease to a new buyer for $75,000, *id.* at 492, deprived the Debtors of most, if not all, of the value of the lease and stock. *Id.* at 497. Thus, we conclude that November 11, 1986, is both the date of the "transfer" alleged to be fraudulent and the relevant date for our present determination of the Debtors' insolvency. *Id.* at 496–97.

In order to determine the solvency of the Debtors, we must ascertain, as of that date: (1) the value of the Debtors' assets; (2) the extent of the Debtors' liabilities; and (3) the extent of the Debtors' exemptions under 11 U.S.C. § 522.

A "fair valuation" of the Debtors' assets requires that we "estimate ... what can be realized out of the assets within a reasonable time either through collection or sale at the regular market value ..." 2 COLLIER, *supra,* ¶ 101.31, at 101–86. The parties do not appear to seriously disagree regarding the identity of assets held by the Debtors. The disagreement exists as to the value of these assets.

Clearly, the asset whose value, as of November 11, 1986, is the most seriously disputed is that of the accounts receivable held by ECP on that date. The parties dispute the balance of the accounts receivables as of November 11, 1986; whether these accounts are "collectible;" and the value to be assigned to these accounts in light of their collection status. The Defendant maintains that the accounts receivable are worth $301,232.27 and are all collectible. The Debtors, on the other hand, maintain that the accounts receivable were last valued at $42,196.44, and that it was

difficult, if not impossible, to collect any of these accounts.

As we noted at Findings of Fact 17–19, at pages 205–06, *supra,* most of the $301,232.27 figure advanced by the Defendant arises from an alleged balance in these accounts of $295,192.17 at the beginning of July, 1986. However, without more evidence than the vacuum of evidence in the present record supporting the accuracy of this figure, we have great difficulty in concluding that the balance of the Defendant's accounts receivable as of July, 1986, could have possibly been so large. In light of Farber's insistence that these creditors normally paid their accounts within two to three weeks, we can rather safely conclude that this sizable balance was *not* in existence on November 11, 1986.

It is clear that the value of ECP's accounts receivable depends in large part upon the collectability of these accounts. 2 COLLIER, *supra,* ¶ 101.31[4], at 101–88 to 101–89; and *In re Coddington,* 118 F. 281 (M.D.Pa.1902). In light of the testimony of Pinto, Jr., and, more reliably, Levin, we have concluded that the accounts receivables of ECP were not, in fact, collectible, as of November 11, 1986. This conclusion is supported rather than contradicted by the Defendant's argument that ECP had a large balance of old accounts receivable still in existence three months after the company ceased operations. In light of our conclusion that these accounts were not collectible, we assign no value to this alleged asset in our "balance sheet" computation.

▮ The Defendant would have us also consider the value of the Debtors' lease as well as their twenty shares of the Defendant's stock. However, the Debtors may establish that a transfer was fraudulent where the Debtors were rendered insolvent "as a result of" the transfer. 11 U.S.C. § 548(a)(2)(B)(i); and *Corbett, supra,* 80 B.R. at 37. Thus, we are concerned here with the balance sheet of the Debtors *after* the Defendant terminated its lease and attempted to exercise its option to repurchase the stock, not before. Since the Debtors' lease at the terminal was terminated on

that date as part of the transfer in issue, we cannot consider the lease-value as an asset-entry on the Debtor's balance sheet.

■ Even if we were to consider the lease and stock as assets on the Debtor's balance sheet, it must be recalled that we previously found that the shares of stock held by the Debtors were worthless, because their ownership was not accompanied by the concomitant privilege of renting a unit at the Defendant's terminal. 89 B.R. at 497. Despite the Defendant's full opportunity to mend the flaws in its case, at the hearing of December 6, 1988, it was unable to produce any additional evidence that would warrant a change in this finding. Farber originally testified that nobody would be interested in purchasing the terminal's stock without the right to also lease a unit at the time. At the December 6, 1988, hearing, he testified concerning several isolated instances where parties who remained nominally inactive stockholders no longer had leases. However, Farber was compelled to admit that he was not aware of anyone who had ever initially purchased stock without a lease, nor did he present any reason why anyone would, practically, ever do so. In sum, his testimony in no sense undermined our previous conclusion that the only reason that anyone would ever pay anything for the Defendant's stock would be to obtain the right to lease a unit at the Defendant's terminal.

However, while the Debtors would probably be unable to sell their stock to any third person, the Defendant continues to be willing to pay the Debtors $8,400.00 for it. Accordingly, we shall count this amount as a post-transfer asset available to the Debtors.

■ The most serious disagreement regarding the Debtors' liabilities relates to the amount of the Debtors' accounts payable. We agree with the Defendant that the Debtors' Exhibit P–50, being distant in time from the relevant date of November 11, 1986, is of limited relevance. However, we do not agree with the Defendant's suggestion that the amount of accounts payable outstanding on August 1, 1986, is totally irrelevant to the issue of accounts payable still outstanding on November 11, 1986. As noted by the Defendant, the unsecured debts listed in the Debtors' Schedule A–3, as well as the twenty-one (21) proofs of claims filed against the Debtors, are mostly duplicates of the accounts payable listed in the Debtors' records. However, the fact that twenty (20) of the creditors listed by the Debtors are also listed on their Schedule A–3 suggests that these obligations were not satisfied in the interim. This conclusion is reinforced by the testimony of Pinto, Jr. that the ECP accounts payable were not paid after the business ceased operations in mid-August, 1986. The total amount of the accounts payable outstanding on August 1, 1986, for these twenty (20) creditors was $250,-619.05. We conclude that these accounts payable were still outstanding on November 11, 1986.

■ The exemptions which the Debtors may claim under the Bankruptcy Code are clearly set forth at 11 U.S.C. § 522 and need not be reiterated here. However, we do note that the Debtors here are *each* entitled to the exemptions set forth at § 522(d), thus doubling the value of those exemptions in the calculations as to both Debtors here. *See Corbett, supra,* 80 B.R. at 38 n. 5; and *In re Lambert,* 10 B.R. 11 (Bankr.N.D.Ind.1980).

Having previously, throughout this Opinion, assigned values to the assets and liabilities of the Debtor based on the testimonial and documentary evidence in the record from both hearings, we shall proceed to determine the Debtors' solvency by examining their "balance sheet" as we did in *Corbett,* 80 B.R. at 38. The evidence here presents the following financial picture of the Debtors as of November 11, 1986:

1. Asset

| Item | Value | Exemption | Non–Exempt Value |
|---|---|---|---|
| Residence | $124,000 | $15,000<br>11 U.S.C. § 522(d)(1) | $109,000 |

| Item | Value | Exemption | Non–Exempt Value |
|---|---|---|---|
| 1982 Plymouth | $3,500 | $2,400<br>11 U.S.C. § 522(d)(2) | $1,100 |
| Refrigerator | 700 | 400<br>11 U.S.C. § 522(d)(3) | 300 |
| Dining Room Set | 400 | 400<br>11 U.S.C. § 522(d)(3) | –0– |
| Living Room Set | 400 | 400<br>11 U.S.C. § 522(d)(3) | –0– |
| Jewelry | 2,000 | 500 [6]<br>11 U.S.C. § 522(d)(4) | 1,500 |
| Cash | 200 | –0– | 200 |
| Deposits | 150 | –0– | 150 |
| Electric Jacks and Trailers | –0– | –0– | –0– |
| 20 Shares PFFT Stock | 8,400 | 800<br>11 U.S.C. § 522(d)(5) | 7,600 |
| Life Insurance Policies | 5,500 face value | all<br>11 U.S.C. § 522(d)(7) | –0– |
| Accounts Receivable | –0– | –0– | –0– |
| | | TOTAL | $119,850 |

2. Liabilities

| | |
|---|---|
| Frankford Trust Co. | $ 96,294.13 |
| Prudential Savings Ass'n. | 18,500.00 |
| Accounts Payable | 250,619.05 |
| Other Claims and Liabilities | 68,505.84 |
| TOTAL | $433,919.02 |

---

As a result, it can be seen that the Debtors' debts ($433,919.02) exceeded their non-exempt assets ($119,850) by $314,069.02. The Debtors were therefore clearly insolvent on November 11, 1986, subsequent to the transfer of their interests in the lease at the Defendant's terminal and the twenty (20) shares of Defendant's stocks. Having determined that the Debtors were in fact insolvent as of this crucial date, we conclude that the termination of the Debtors' lease and its exercise of the option to purchase the Debtors' twenty (20) shares of stock by the Defendant on November 11, 1986, constituted a fraudulent transfer of

6. These assets belonged solely to Mary as opposed to being jointly owned by Pinto, Sr. and Mary, as were the other assets.

interests of the Debtors, avoidable under 11 U.S.C. §§ 548(a)(2)(A) and (a)(2)(B)(i).

## II. THE DEBTORS' ESTATE IS ENTITLED TO RECOVER THE VALUE OF THE TWENTY SHARES OF DEFENDANT'S STOCK IN EXCHANGE FOR ITS CANCELLATION

■ Section 550 of the Bankruptcy Code provides as follows:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section ... 548 ... of this title, the trustee may recover for the benefit of the estate, the property transferred, *or if the court so orders, the value of such property,* from—

(1) the initial transferee of such transfer or the entity for whose benefit was made, or

(2) any immediate or mediate transferee of such initial transferee (emphasis added).

Thus, while recovery for a fraudulent transfer under § 548 is normally an avoidance of the transfer, *see Corbett,* 80 B.R. at 35, the court may alternately grant monetary damages to the debtor-transferor reflecting the value of the property fraudulently transferred. *See* 4 COLLIER, *supra,* ¶ 550.02, at 550–6.

We believe that an award of monetary damages is appropriate in the present case. The Defendant has clearly indicated that it no longer wishes to lease to the Debtors. Moreover, reinstatement of the Debtors' lease and stock would be of limited value to the Debtors in light of Pinto, Sr.'s present inability to continue business.[7]

■ We have previously determined that the Defendant's actions of terminating Pinto, Sr.'s lease and exercising its option to repurchase its stock deprived the Debtors of an interest in the leasehold and stock worth between $75,000 to $150,000. *Pinto,*

89 B.R. at 500. However, since the new shares of stock issued by the Defendant were purchased for $75,000, we shall limit the Debtors' recovery to this amount.

■ Finally, we shall order the Debtors' stock cancelled as a result of this recovery. The transfer effectively invalidated the stock. However, we believe that the stock should be legally invalidated to provide a symmetrical resolution of this matter.

## III. DEFENDANT IS NOT ENTITLED TO RECOVER BACK RENT FROM THE DEBTORS

■ As noted previously, the Defendant, in a Counterclaim included in its Amended Answer, seeks an award of damages for rental payments for the period between November 1, 1986, when the Debtors last paid rent for their unit, and June 30, 1987, when the unit was leased to a new tenant. However, we note here, as we have in previous cases, that "monetary claims against debtors should normally be relegated to the claims process." *In re Clark,* 91 B.R. 324, 338 (Bankr.E.D.Pa. 1988). *See also, e.g., In re Stelweck,* 86 B.R. 833, 845 (Bankr.E.D.Pa.1988); *In re New York City Shoes, Inc.,* 84 B.R. 947, 960 (Bankr.E.D.Pa.1988); and *In re International Endoscope Manufacturers, Inc.,* 79 B.R. 620, 621–22 (Bankr.E.D.Pa.1987). It does not appear that the Defendant here has filed a claim against the Debtors. *See* 11 U.S.C. § 502. The bar date for filing claims in the Debtors' case, since its conversion to Chapter 7, appears to have been October 31, 1988, since the meeting of creditors pursuant to 11 U.S.C. § 341, was conducted on August 1, 1988. *See* B.Rule 3002(c). Therefore, the claim may be barred.[8] In addition, the merits of the Defendant's claim for back rent is highly questionable, since it is seeking rental payments pursuant to the lease that it terminated in November, 1986. Finally, the

---

7. We note that the present case was converted to a Chapter 7 case in June, 1988.

8. We do note that it is possible that the Defendant's Counterclaim, filed on the bar date, October 31, 1988, could be considered as an "infor-

mal proof of claim." *See, e.g., In re Clark,* 96 B.R. 569, 573 (Bankr.E.D.Pa.1989); and *In re Ungar,* 70 B.R. 519, 521–23 (Bankr.E.D.Pa.1987). However, to date the Defendant has not asked that this be done.

Debtors tendered their rental payment for November, but it was returned by the Defendant. *See* 89 B.R. at 492 (Finding of Fact 26). This may constitute a waiver of any subsequent rent claims.

CONCLUSION

An Order consistent with our Findings of Fact and Conclusions of Law expressed herein shall be entered.

ORDER

AND NOW, this 30th day of March, 1989, this matter having come before the Court for a supplemental hearing on December 6, 1988, upon the Debtors' Amended Complaint and the Defendant's Amended Answer, and the Court having considered the evidence presented at that time together with the parties' post-trial submissions, and the Findings of Facts and Conclusions of Law made previously in this matter in *In re Pinto*, 89 B.R. 486 (Bankr. E.D.Pa.1988), it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of the Debtors, MARY PINTO, INDIVIDUALLY, AND JOSEPH PINTO, INDIVIDUALLY AND TRADING AS EAST COAST PRODUCE, and against the Defendant, PHILADELPHIA FRESH FOOD TERMINAL CORPORATION, on the Debtors' claim pursuant to 11 U.S.C. § 548(a)(2) in the amount of $75,000.00.

2. The Defendant is authorized to cancel the Debtors' shares of stock in it.

3. The Debtors' claim against the Defendant on the basis of unjust enrichment is hereby DISMISSED.

4. The Defendant's Counterclaim against the Debtors for back rent allegedly due and owing is hereby DISMISSED.