In re Thomas **BARRETT** and Sharon B. Barrett, Debtors.

Thomas **BARRETT** and Sharon B. Barrett, Plaintiffs,

v.

**COMMONWEALTH FEDERAL SAVINGS AND LOAN ASSOCIATION** and **Robert J. Gunn** and **John D. Green,** Sheriff, City of Philadelphia, Defendants.

Bankruptcy No. 89–10738S.
Adv. No. 89–0635S.

United States Bankruptcy Court, E.D. Pennsylvania.

Aug. 17, 1989.

Jerome Brian Blank, Philadelphia, Pa., for debtors.

Warren T. Pratt, Ellen McDowell, Drinker, Biddle & Reath, Philadelphia, Pa., for Commonwealth Federal Sav. and Loan Ass'n.

Eugene Brazil, Fort Washington, Pa., for Robert J. Gunn.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 Trustee.

## ADJUDICATION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. FINDINGS OF FACT

1. The joint Chapter 13 bankruptcy case underlying this proceeding was filed on February 24, 1989, by THOMAS BARRETT and SHARON B. BARRETT (hereinafter "the Debtors"). The adversary proceeding was filed on July 6, 1989, by the Debtors pursuant to 11 U.S.C. § 548(a)(2), to attempt to invalidate a sheriff's sale of December 5, 1988, of the Debtors' home, located at 3205 Brighton Street, in the Mayfair section of Philadelphia, Pennsylvania (hereinafter "the Home"), in execution upon a judgment in mortgage foreclosure.

2. This proceeding was preceded by an Order of June 13, 1989, in the main case, granting the motion of COMNET MORTGAGE SERVICES, INC., apparently the successor to Defendant COMMONWEALTH FEDERAL SAVINGS AND LOAN ASSOCIATION, the mortgagee foreclosing upon the Debtors' home (hereinafter "the Mortgagee"), and ROBERT J. GUNN, the purchaser at the sale (hereinafter "Gunn") (hereinafter the Mortgagee and Gunn are referred to collectively as

"the Defendants"),[1] for relief from the automatic stay to allow them to exercise their rights under state law to evict the Debtors from the Home. This relief was mandated because the sale of the Home at the sheriff's sale executing upon a judgment against them in mortgage foreclosure had preceded the bankruptcy filing. *See In re Roach*, 824 F.2d 1370, 1377–79 (3d Cir. 1987); and *In re Brown*, 75 B.R. 1009, 1010–12 (Bankr.E.D.Pa.1987).

3. However, in our Order of June 13, 1989, we noted the possibility of the Debtors' filing a proceeding under 11 U.S.C. § 548(a)(2) such as the instant matter, to save the Home. After the filing of this proceeding, on motion of the Debtors and by agreement of counsel, we issued an Order of July 14, 1989, staying any proceedings of the Defendants to evict the Debtors from the Home pending disposition of this proceeding. Trial was scheduled and heard on an expedited basis on August 3, 1989.

4. The Home was purchased by Gunn, the successful bidder at the sheriff's sale, for $66,000. Gunn is a neighborhood resident, not a real estate speculator, and there is no dispute that he acted apart from the Mortgagee and in good faith in effecting the purchase.

5. The Husband–Debtor (hereinafter "the Husband") purchased the Home in his own name only in August, 1975. He married the Wife–Debtor (hereinafter "the Wife") shortly thereafter on October 11, 1975. The family, now including children aged 10 and 12 years, has resided in the Home continuously since that date, and clearly intends to reside there in the future unless the Debtors are evicted therefrom. The Home remains, however, titled solely in the name of the Husband.[2]

6. The delinquency on the mortgage arose due to the Wife's mismanagement of the family's financial obligations and her concealment of the foreclosure proceedings

from the Husband until after the sheriff's sale had already occurred.

7. One very significant factual issue of dispute involves the value of the Home at the time of the transfer, which the parties agree must be measured as of the date of the sheriff's sale, *i.e.*, December 5, 1988. *See Butler v. Lomas & Nettleton Co.*, 862 F.2d 1015, 1017–19 (3d Cir.1988).

Three admittedly and apparently equally well-qualified real estate appraisers testified at the trial. The Debtors called two such witnesses. The first, Joseph Gaul (hereinafter "Gaul"), had conducted an independent appraisal for Oxford Home Equity in connection with a loan application of the Debtors on May 26, 1988, and he valued the Home at that time at $93,000. The second, Anthony L. Salvitti (hereinafter "Salvitti"), hired by the Debtors for this trial, testified that the value of the Home was $98,000 on July 18, 1989, and $95,500 on December 5, 1988. Salvitti further testified that, during the last several years, appreciation of properties in this area has occurred at the rate of five (5%) percent per year. Finally, he also indicated great familiarity with this particular area and block, and stated that the homes in this block were particularly well-constructed, attractive, and marketable.

The Defendants, meanwhile, called Valentino H. Pasquarella, Sr. (hereinafter "Pasquarella'), as their expert. After an inspection of the Home on July 19, 1989, Pasquarella appraised the property, as of December 5, 1988, at $85,000.

All three appraisers relied heavily on the market-analysis approach, making adjustments for the favorable (modern kitchen) and unfavorable (basement unfinished, garage and driveway in need of some repair) features of the Home. The difference in result arises from the use of different comparable properties. Pasquarella utilized three comparables, a very similar home across the street which settled for $89,000 on August 2, 1988, and homes which sold

---

1. Defendant GREEN, obviously perceiving himself as a mere stakeholder, has not appeared in this matter.

2. For this reason, we order that the Complaint be dismissed as to the Wife. She has no legal interest in the property of which a disposition is sought to be avoided.

for less in September, 1988, and November, 1988, on nearby Tyson Avenue and Guilford Street. Gaul utilized three homes on Teesdale Street (two) and Braus Avenue which sold between February and March, 1988. Salvitti utilized sales of two residences in the same block as the Home, one a more valuable corner property which had closed at $104,000 on April 28, 1989, and the other a very similar home four doors away from the Home presently under agreement of sale for $96,900. The third, quite a distance away and across from a park, closed at $100,000.

We conclude that the Home was worth $95,000 on December 5, 1988. We place more weight on Gaul's estimate than the other two because it was prepared for a purpose unrelated to this litigation and is therefore free of any perceptible bias. *Compare In re Cole,* 81 B.R. 326, 328–29 (Bankr.E.D.Pa.1988) (hereinafter *"Cole I"*); and *In re Blakey,* 76 B.R. 465, 472, *modified,* 78 B.R. 435 (Bankr.E.D.Pa.1987) (most weight is attached to valuations performed in circumstances apparently free from bias). Given the unrebutted statement of Salvitti that appreciation in the area accrued at about five (5%) percent, results in a transposed figure, from Gaul's appraisal as of May 26, 1988, of almost $96,000. This appreciation rate appears very conservative in light of the increment of prices of very similar homes in the same block from $89,000 to $96,900 in the past year.[3] From these sales, we conclude that the appreciation was over eight (8%) percent in the last year in this block.[4]

We believe that Salvitti's comparables are more reliable than those of Pasquarella, because Salvitti chose two properties in the same block as the Home, while Pasquarella chose but one. None of the remaining properties used by either appraiser seemed to be nearly as closely comparable to the Home as the properties located on the same block as the Home. Salvitti was the more knowledgeable party about the immediate neighborhood and block, and therefore we rate his choice of comparables slightly higher. However, we believe that the differences in results were mostly a function of the relative times of the sales from which the comparables were taken. Our analysis of the two closest comparables in the last paragraph convinces us that an appreciation rate of eight (8%) percent in the past year is the main reason for the approximately nine (9%) percent difference in these results.

Taking the appraisals of Gaul and Salvitti together only, we would probably arrive at a figure of $97,000, adjusting Gaul's figure at four (4%) percent over a six-month period. Respect for Pasquarella, whose report was infused with some degree of bias as that of Salvitti, causes us to reduce our figure slightly.

We therefore conclude that, at the time of the sheriff's sale of December 5, 1988, the fair market value of the Home was $95,000.

8. The Husband, who we found to be a totally credible witness,[5] testified that, as of December 5, 1988, he owed the following debts:

---

**3.** These two homes, 3204 Brighton Street (August, 1988 sale) and 3213 Brighton St. (under present agreement of sale) appear almost identical. The former home contained an extra powder room not in the Home. The latter also contained such an extra powder room, but the kitchen of the latter has not been remodelled, as was that of the Home. Thus, if anything, the 3204 property, which sold for less, appears superior.

**4.** We note that a chart appearing in our local newspaper on August 16, 1989, indicated that housing prices in the City of Philadelphia appreciated at an average of 6.8 percent in the past year. NATIONAL ASSOCIATION OF REALTORS, THE MOST EXPENSIVE HOUSING MARKETS, Philadelphia Inquirer, at 16–C, col. 2.

**5.** We are aware that the Debtors' Schedules included only three debts (to counsel, a post-petition administrative creditor; to the Mortgagee; and to the Philadelphia Gas Works, at $3,500). We accept the Debtor's statements that those figures are not accurate through oversight of the Debtors and/or counsel in omitting viable debts and that the Schedules will be amended accordingly. The Husband's accuracy is reinforced by the facts that many of the debts listed here were supported by documented bills and at least one of the personal loans was supported by the Wife's prior testimony.

| | |
|---|---|
| Philadelphia Gas Works | $3,304.64 |
| Philadelphia Electric Co. | 1,922.48 |
| City of Philadelphia (water and sewer bill) | 936.46 |
| City of Philadelphia (real estate taxes) | 2,813.71 |
| Internal Revenue Service | 884.57 |
| Pennsylvania Blue Shield | 1,215.00 |
| Nazareth Anesthesia Associates | 61.00 |
| Nazareth Hospital | 127.19 |
| Nazareth Hospital (different account) | 135.44 |
| Sentry Insurance Co. | 4,239.00 |
| Joe Martin | 5,800.00 |
| Horace Morton | 5,800.00 |
| Nicholas DeAngelis | 5,076.00 |
| William Barrett | 700.00 |
| TOTAL | $33,015.49 |

9. Also admitted into evidence were three searches of the Husband's title of the Home. Only one, admitted into evidence by stipulation of the parties, contained on it a figure of the net proceeds of the sale to the Husband after allowance for the judgments recited thereon, i.e., $37,211.37 (Exhibit P–14). Exhibit P–14 recited only 1988 taxes assessed at $1,409.41; water and sewer rents through December 5, 1988, including $81.38 for the last cycle; and the recording of water and sewer liens, the latest of which was September, 1988, totalling $729.43, as liens which would be considered in computation of the net proceeds of the sale. Notably, Exhibit P–14 makes no reference to the judgment obtained against the Husband by Sentry Insurance Co. (hereinafter "Sentry"). The Sentry judgment is included on the other searches.

## B. CONCLUSIONS OF LAW

1. This court has jurisdiction to hear and determine this matter, as it is a core proceeding. See 28 U.S.C. §§ 157(b)(1), (b)(2)(H). But see Granfinanciera, S.A. v. Norberg, —— U.S. ——, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989). No jury trial was requested, and the admission in the answers that this matter is core constituted irrevocable consent that we hear and determine it. See In re St. Mary Hospital, Bonner v. Hiser, 101 B.R. 451, 454, 457 (Bankr.E.D.Pa.1989).

2. The sheriff's sale of December 5, 1988, was a transfer of property made within one year from the date of the Debtors' filing their petition in bankruptcy on February 24, 1989.

3. The Debtors have, though just barely, met their burden of proving that the Husband received less than a reasonably equivalent value for the property in this transfer. See In re Pinto Trucking Service, Inc., 93 B.R. 379, 388–90 (Bankr.E.D.Pa.1988). The price received in the transfer ($66,000) is 69.5 percent of the fair market value of the Property of $95,000, slightly less than the seventy (70%) percent benchmark which we have consistently accepted. See Durrett v. Washington Nat'l Ins. Co., 621 F.2d 201, 203–04 (5th Cir. 1980); Cole I, supra, 81 B.R. at 329–30; In re Corbett, 80 B.R. 32, 36–37 (Bankr.E.D. Pa.1987); In re Butler, 75 B.R. 528, 532–33 (Bankr.E.D.Pa.1987), rev'd on other grounds sub nom. Butler v. Lomas & Nettleton Co., supra; and In re Jones, 20 B.R. 988, 993–94 (Bankr.E.D.Pa.1982) (per GOLDHABER, CH. J.). See also In re Clark, 99 B.R. 955, 956–57 (Bankr.W.D.Mo. 1989) (finding that purchaser paid exactly seventy (70%) percent of value does not protect a sheriff's sale from attack under § 548(a)(2)).

4. We assume, arguendo, that the Debtors bear the burden of proving insolvency. But see In re Joshua Slocum, Ltd. Joshua Slocum, Ltd. v Boyle, 103 B.R. 610, 620–21 (Bankr.E.D.Pa. 1989); United States v. Gleneagles Investment Co., 565 F.Supp. 556, 577 (M.D.Pa.1983), aff'd sub nom. United States v. Tabor Court Realty Corp., 803 F.2d 1288 (3d Cir.1986), cert. denied sub nom. McClellan Realty Co. v. United States, 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987); In re Pinto, 98 B.R. 200, 209 (Bankr.E.D.Pa.1989); In re Leinheiser, 51 B.R. 164, 166 (Bankr.E.D. Pa.1985); Baker v. Geist, 457 Pa. 73, 78, 321 A.2d 634, 637 (1974); and Farmers Trust Co. v. Bevis, 331 Pa. 89, 91, 200 A.54, 55 (1938) (if the party seeking to avoid a transfer as fraudulent establishes inadequate consideration, the burden of proving solvency shifts to the party seeking to uphold the transfer). We conclude that they have met this burden, albeit again by a small margin.

In making this analysis, it must be recalled that it is only the Husband's solven-

cy that is in issue, as the Home remains solely in his name. The applicable statute, 11 U.S.C. § 548(a)(2)(B)(i), allows the Husband the option of establishing that he was insolvent prior to the sheriff's sale, or that he became insolvent as a result of it. Here, the Husband has chosen to attempt to prove insolvency on the second alternative basis.

The debts recited by the Husband totalled $33,015.49 as of December 5, 1988. All appear to have been obligations for which the Husband was jointly and severally liable with the wife, and hence they are properly considered as his debts. However, it seems clear to us that liened obligations of the Husband recited on Exhibit P–14 must have been deducted from the gross proceeds due to the Husband from the sale to reach the net sum recited thereon, i.e., $37,211.36. Therefore, we will deduct, from the $33,015.49, the following:

| | | |
|---|---|---|
| Beginning Debt balance | $33,015.49 | |
| 1988 Philadelphia Real estate taxes | – | 1,409.41 |
| Water and sewer rents liened through the date of sale | – | 729.43 |
| Subtotal | $ 2,131.84 | |
| Ending Debt Balance | $30,983.65 | |

We cannot take judicial notice of the alleged "fact" that the earlier real estate taxes and water and sewer charges and the Sentry judgment were deducted from the net proceeds stated, by Exhibit P–14, to be due to the Husband, as the Defendants urge. This is not a fact "generally known" by all persons within this jurisdiction and it is not a matter "capable of accurate and ready determination," like a mathematical calculation. Federal Rule of Evidence 201(b). *See In re Cole*, 89 B.R. 433, 438–39 (Bankr.E.D.Pa.1988) (hereinafter *"Cole II"*). If the Defendants are correct that these entire obligations are valid liens [6] which are properly deductible from the net proceeds which the Husband will receive, then the figure of $37,211.36, which appears on the title search containing only

these charges as liens, would have to be adjusted downward accordingly.

After these adjustments, the amount remaining due, $37,211.36 less $30,983.63, still leaves a balance of $6,227.71. Insolvency under the Bankruptcy Code is clearly established by a "balance sheet test," i.e., a debtor is deemed insolvent only if his liabilities exceed his assets at the crucial point in time, here December 5, 1988, the date of the transfer. 11 U.S.C. § 101(31)(A); *Joshua Slocum, supra,* 103 B.R. at 621; *In re Pinto,* 98 B.R. 200, 209 (Bankr.E.D.Pa.1989); and *Corbett, supra,* 80 B.R. at 37–38.

However, it is equally clear that the Husband's exemptions allowable under 11 U.S.C. § 522(d) are deductible from his assets in the "balance sheet test" equation. 11 U.S.C. § 101(31)(A)(ii); *Pinto, supra,* 98 B.R. at 211–12; and *Corbett, supra,* 80 B.R. at 38. The evidence at trial established that virtually every asset owned by the Debtor, with the exception of the Home, is owned jointly with his wife. But for $50 attributable to his equity in half of a television set valued at $500, *compare Pinto,* 98 B.R. at 211–12; and *Corbett, supra,* 80 B.R. at 38, the Husband credibly testified that he had no non-exempt assets.

A potentially problematical issue, rendered significant by the fact that the Husband is the sole owner of the Home and hence cannot cumulate his exemptions with the Wife, is whether the Debtor can utilize the homestead exemption of $7,500 in the proceeds of the sale of the Home set forth in 11 U.S.C. § 522(d)(1), or is relegated to the remaining $4,100 of his "wild card" exemption arising under 11 U.S.C. § 522(d)(5).

In analyzing this issue, we begin with the overriding presumption that liberal interpretation in favor of maximum allowances in construing exemption provisions under the Code is required. *See, e.g., In re Sidebotham,* 77 B.R. 504, 506 (Bankr.

---

6. The validity of the City's water and sewer liens appear susceptible to attack in their entirety. *See In re Carlyle,* 100 B.R. 217 (Bankr.E.D.Pa. 1989); *In re McLean,* 97 B.R. 789, 792–98 (Bankr.E.D.Pa.1989), *aff'd,* C.A. No. 89–3016,

(E.D.Pa. May 31, 1989); and *In re Aikens,* 94 B.R. 869, 873–77, *aff'd,* 100 B.R. 729 (E.D.Pa.1989). However, no attack has apparently been levelled against them.

E.D.Pa.1987). The second general principle is that the residence of the debtor at the time of the filing of the bankruptcy petition, *see In re Chandler*, 77 B.R. 513, 516 (Bankr.E.D.Pa.1987), *aff'd*, C.A. No. 87–6516, 1988 WL34921 (E.D.Pa. March 30, 1988), and the future intention of the debtor to continue to reside in that same premises indefinitely, *see In re Grindal*, 30 B.R. 651, 653 (Bankr.D.Me.1983), establish that the debtor is entitled to the homestead exemption of § 522(d)(1). It seems clear that, here, the Husband both resided at the Home and intended to retain it as a homestead for his family, despite the pre-petition sheriff's sale, as of the date of the filing of the Debtors' bankruptcy petition.

■ With the exception of dictum to the contrary in *Corbett, supra*, 80 B.R. at 38 (sale proceeds are said to be exempt under § 522(d)(5); the debtors there, however, were clearly insolvent and the resolution of the issue was hence irrelevant), all pertinent authorities suggest that the homestead exemption should, under the instant circumstances, attach to the sale proceeds. In *In re Huizar*, 71 B.R. 826, 830 (Bankr. W.D.Tex.1987), the court held that sale proceeds can be exempted under the homestead exemption if the property "can be recovered under an avoidance power and returned to the estate." Similarly, in *In re Healy*, 100 B.R. 443, 443–45 (Bankr.W.D. Wis.1989), the court suggested that a homestead exemption could be claimed in proceeds from a pre-petition home sale if and only if the Debtors claimed a "constructive occupation" of the homestead by proving an intention to re-invest the proceeds in another homestead. Here, of course, the Husband is seeking to avoid the transfer of the potentially-exempt Home, retain this very realty as his family's homestead, and return the legal title of the Home to his estate in this very proceeding. Also supportive of the homestead allowance to the Debtor here were the allowances of homestead exemptions to, respectively, sale and insurance proceeds received from dispositions of homes of debtors in *In*

*re Reed*, 89 B.R. 100, 105 (Bankr.C.D.Cal. 1988); and *In re Sanders*, 72 B.R. 124, 125 (Bankr.M.D.Fla.1987). Speaking to an analogous situation, 3 COLLIER ON BANKRUPTCY, ¶ 522.10, at 522–49 (15th ed. 1989), states as follows:

> When a debtor's homestead is subject to a valid mortgage that is not subject to any of the trustee's or debtor's avoiding powers, and the property is sold because of its indivisibility, the debtor is entitled to an exemption in any surplus resulting from the sale.

The foregoing authority convinces us that the Debtor is entitled to the $7,500 homestead exception provided in 11 U.S.C. § 522(d)(1) as to the proceeds of the sale of the Home. He also is entitled to the remaining $350 of his "wild-card" exemption set forth in § 522(d)(5). The sum of these allowable exemptions ($7,850) exceeds the balance of the Husband's assets less his liabilities ($6,227.71). Therefore, we conclude that the Husband was insolvent as of the crucial sale date of December 5, 1988.

5. The Debtors have established that the transfer effected by the sheriff's sale of the Home of December 5, 1988, may be avoided pursuant to 11 U.S.C. §§ 548(a)(2)(A) and (a)(2)(B)(i).

6. Since we are uncertain regarding the appropriate pertinent figures, we must relegate ascertainment of the amount of the respective liens of the Morgagee and Gunn against the Home under 11 U.S.C. § 548(c) to the proof of claims process.[7] *Accord, In re Orsa Associates, Inc.*, 99 B.R. 609, 622 (Bankr.E.D.Pa.1989); *Cole II, supra*, 89 B.R. at 438–39; *Cole I, supra*, 81 B.R. at 338–39; and *Corbett, supra*, 80 B.R. at 38.

The Mortgagee obviously would appear to have a valid claim to a lien based upon its judgment and assertion of reasonable additional costs and fees. *See Cole II, supra*, 89 B.R. at 438–39; and *Corbett*, 80 B.R. at 38. Less clear is measurement of the lien to the extent that Gunn "gave value to the debtor in exchange for such

---

7. The bar date appears to be September 28, 1989, giving the Defendants a sufficient opportunity to file proofs of claims.

transfer or obligation" to which he is entitled. *See id.* It would seem that he would be able to assert a lien against the Home for any non-refundable payments, costs, and possibly reasonable attorneys' fees advanced. *See generally* 4 COLLIER, *supra,* ¶ 548.07, at 548–82.[8]

## ORDER

AND NOW, this 17th day of August, 1989, after a trial of the above adversary proceeding on August 3, 1989, and upon consideration of the post-trial arguments by the parties, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of the Husband–Debtor, THOMAS BARRETT, and against the Defendants, COMMONWEALTH FEDERAL SAVINGS AND LOAN ASSOCIATION, ROBERT J. GUNN, and JOHN D. GREEN, SHERIFF, CITY OF PHILADELPHIA.

2. As the Wife–Debtor, SHARON B. BARRETT, has no interest in the property in issue, the Complaint is DISMISSED as to her.

3. The transfer of December 5, 1988, of the interest of the Husband–Debtor in the property situated at 3205 Brighton Street, Philadelphia, Pennsylvania 19149, is hereby set aside, pursuant to 11 U.S.C. § 548(a)(2).

4. On or before August 31, 1989, the Defendants shall take all steps necessary to effectuate paragraph three of this Order.

5. The determination of any rights of the Defendants to liens against the above property pursuant to 11 U.S.C. § 548(c) shall be DEFERRED for resolution in the claims process of the Debtors' case.

---

**8.** The Debtors may conclude that they are unable to devise a feasible plan which would satisfy the lien-based secured claims of the Defendants under 11 U.S.C. § 548(c). In that case, they would perhaps be well advised to accept the net proceeds of $37,211.36 to which they would apparently be entitled and forego the benefit of this judgment in their favor. People faced with an opportunity to save their home understandably rarely view matters in this light.