**In re Thomas J. BARRETT,
Sharon B. Barrett.**

Civ. A. No. 90–3615.

Bankruptcy No. 89–10738S.

United States District Court,
E.D. Pennsylvania.

Aug. 22, 1990.

Eugene F. Brazil, Fort Washington, Pa., for appellant Commonwealth Federal.

Warren T. Pratt, Philadelphia, Pa., for Savings & Loan-bank.

Edward Sparkman, Jerome Brian Blank, Philadelphia, Pa., for debtor.

Thomas Joseph Barrett, Philadelphia, Pa., pro se.

## MEMORANDUM

LUDWIG, District Judge.

This is the foreclosure sale purchaser's second appeal from the bankruptcy court's order, first entered August 17, 1989, 104 B.R. 688, and re-instated April 27, 1990, 113 B.R. 175, setting aside the sheriff's sale of debtor Thomas Barrett's residence as a fraudulent transfer under the bankruptcy code. 11 U.S.C. § 548(a)(2). On February 14, 1990, the first order was vacated and the action remanded. Thereafter, the bankruptcy court again voided the sale, finding the price to have been inadequate because the sale had not been sufficiently advertised or competitively bid in comparison with a "normal" residential realty sale in Philadelphia. The sheriff's sale was conducted on December 5, 1988, and the sheriff conveyed the property to appellant by deed dated January 4, 1989. On February 24, 1989 debtors filed a voluntary bankruptcy petition.[1]

Appellant, the successful bidder, contends that the bankruptcy court again erred in determining that the sheriff's sale price did not constitute a "reasonably equivalent value" for the real estate under § 548 of the Bankruptcy Code.[2]

---

1. The mortgagee's proof of claim for the debt, interest, and costs including attorney's fees amounts to $36,310.64. The successful bidder's proof of claim, which covers loan interest, insurance, a complaint in ejectment and writ of possession, other costs, and attorney's fees, is for $10,553.65.

2. Jurisdiction: 28 U.S.C. § 158(a). Review of legal conclusions is plenary. The clearly erroneous standard applies to findings of fact. *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir.1986).

    Section 548 of the Bankruptcy Code:
    (a) The trustee may avoid the transfer of an interest of the debtor in property, or any obli-

The factual history has been recited previously. *Barrett v. Commonwealth Federal Savings and Loan*, 111 B.R. 78, 79 (E.D.Pa.1990). Initially, the bankruptcy court set aside the sale because "[t]he price received in the transfer ($66,000) is 69.5 per cent of the fair market value of the property of $95,000, slightly less than the seventy (70%) percent benchmark we have consistently accepted," citing *Durrett v. Washington National Ins. Co.*, 621 F.2d 201, 203–04 (5th Cir.1980). 104 B.R. at 691.

On the first appeal, the bankruptcy court's order was vacated to the extent that it relied on *Durrett:*

The "70 percent rule" referred to in *Durrett* has been widely criticized (citations omitted).... *Durrett's per se* rule would discourage bidding at foreclosure sales if only because of the uncertainty as to hindsight appraisement and the expense, delay, and inconvenience caused by bankruptcy proceedings. Arguably, it would have the counter-productive effect of depressing foreclosure sale prices (citations omitted).... Conceptually, it creates a *de facto* redemption right in bankruptcy that conflicts with the policies underlying state foreclosure statutes.

111 B.R. at 80–81.

The action was remanded to determine whether under § 548(a)(2) a "reasonably equivalent value" was obtained at the foreclosure sale in light of the surrounding circumstances. *Id.* at 81. Specifically, the bankruptcy court was directed to consider whether competitive bidding was encouraged, whether the sale was widely advertised, and whether an arm's length relationship existed among the parties. *Id.* at 81. The approach adopted in *Matter of Bundles*, 856 F.2d 815 (7th Cir.1988) was expressly endorsed. There, it was noted that while fair market value was a starting point, the bankruptcy court in a § 548 case

"must focus ultimately on the fair market value as affected by the fact of foreclosure." *Id.* at 824.

As a practical matter, the foreclosure sale price is the only means of measuring the effect of foreclosure on the value of the property. Indeed, in usual circumstances, it would be appropriate to permit a *rebuttable* presumption that the price obtained at the foreclosure sale represents reasonably equivalent value. However, the bankruptcy court also must determine whether the procedures employed were calculated not only to secure for the mortgagee the value if its interest but also to return to the debtor-mortgagor his equity in the property. *Id.* at 824.

On March 22, 1990, upon remand, the bankruptcy court held a supplemental hearing. A member of the Philadelphia sheriff's office testified that the foreclosure sale was advertised three times in both the *Philadelphia Tribune* and the *Legal Intelligencer* in accordance with procedures mandated by state law. Tr. 37, 44. In response to questioning by debtor's attorney, the president of the *Philadelphia Tribune* stated that his paper's "editorial content is directed to the African–American community, but I can assure you that it's read by more than that." Tr. 18. He testified that the *Tribune's* total circulation is 111,000 (Tr. 12) and that the paper, established in 1884, has been used to publish legal notices by federal, state, and local governments since 1972. Tr. 16.

Appellant testified that he learned the property was listed for sale as early as April, 1988 based on information in the *Legal Intelligencer*—available without charge at the sheriff's office. Tr. 52. He observed that there were 20 bidders present at the December 5, 1988 sale and that it was "standing room only." Tr. 53–5. He estimated that there were a total of

gation incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily

\* \* \* \* \* \*

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.

450 individual bids, mostly in $100 increments. Tr. 53–4. Appellant's real estate expert, questioned as to the relationship of the sale price at a sheriff's sale to the market value of the property, stated, "We have found that when properties go up for Sheriff's sale they sell at a substantial discount from the market value, it can be as much as 50 percent." Tr. 65.

In its April 27, 1990 decision, the bankruptcy court outlined that "[o]ur first task is determining the relationship between the sale price received and the conditions of the sale, the latter of which the district court has mandated us to consider." Op. at 180. Applying this court's ruling to the facts developed at the supplemental hearing, the bankruptcy court held that "the conditions of the sale in issue, a 'typical' Philadelphia County sheriff's sale, did not feature advertising nor encourage competitive bidding in any way comparable to a 'normal' private sale of residential realty in Philadelphia." Op. at 175.

In particular, the bankruptcy court found that "advertising of the sale ... in the *Tribune* as opposed to another newspaper of wider circulation in the community where the home was located is another factor supporting the conclusion that this particular sheriff's sale was not widely advertised." Op. at 183. It did not "attach much significance" to testimony on spirited bidding at the sale, since "[w]e have no information regarding these bidders" and because testimony showed "almost all bidders at Philadelphia sheriff's sales are speculators looking for bargains who are prepared to put up cash for their purchase." Op. at 183. It considered the testimony of appellant's expert significant in proving the trustee's point that "a sheriff's sale, even if conducted in strict accordance with state law, is simply not the equivalent of a commercially-reasonable sale." Op. at 183.

While acknowledging that use of *Durrett*'s 70 percent cut off had been rejected by this court, the bankruptcy court said:

[I]t is clear that, when the commodity sold is readily marketable under conditions which could be expected to yield close to the full market value of the property, and is not sold under such conditions, receipt of less than 75% of the fair market value is a significant factor in determining whether a sale should be set aside because it is not 'commercially reasonable.'

Op. at 184. It concluded that "[t]he actual value received in a sale, irrespective of its conditions, is still the single most important factor of its commercial reasonableness." Op. at 184.

The bankruptcy court did not focus directly on the issue emphasized by this court's decision, i.e., the fair market value *as affected by the fact of foreclosure*. Although the analysis may start with a comparison of the sale price and the fair market value of the property, the inquiry should go further. The fair market value finding, which is one basis of the comparison, is a somewhat malleable number. Here, the $95,000 valuation followed evidence of three real estate appraisals—$85,000 and $95,500 as of the date of the sale and $93,000 seven months earlier. 104 B.R. at 690. It also almost coincided with the highest appraisal, which was presented on behalf of the bankrupt. Had the bankruptcy court simply averaged the three appraisals, it would have arrived at a value of $91,167. Then the successful bid would have been 72.5 percent of that figure and would have exceeded 77.5 percent of the lowest fair value appraisal.

Examining the sale price in terms of the surrounding circumstances circumscribes the arbitrary effects of this "numbers game." On remand, the supplemental hearing was the proper vehicle to consider such information. However, the bankruptcy court's determination is not supported by the evidence received.[3]

The uncontested testimony was that the sale was advertised in accordance with

---

3. Under § 548, the burden of proof to avoid the transfer would appear to be on the trustee. *See In re Barrett,* 104 B.R. 688, 692 (Bankr.E.D.Pa. 1989); *In re Pinto Trucking Service, Inc.,* 93 B.R. 379, 388 (Bankr.E.D.Pa.1988). In the subse-

quent decision below, the bankruptcy court questioned the allocation where the scope of the inquiry went beyond the comparison of the sale price and the fair market value. Op. at 178–79. Even if the burden were shifted to the success-

standard procedures that comported with state law. There was no evidence that this sale compared unfavorably with other Philadelphia foreclosures or would have produced a higher price if advertised differently. The bankruptcy court would postulate a mass circulation advertising standard that was not shown to be realistic or necessary.

The bankruptcy court also discounted the testimony as to the large number of bidders and the high degree of competitive bidding—inasmuch as the bidders may have been "speculators looking for a bargain." Indeed, it would be surprising *not* to find such bidders at a foreclosure sale. Nothing suggests that this sale was less than at arm's length.

The testimony of appellant's expert that sheriff's sales may yield less than 50 percent of market value should buttress a finding that the sale price obtained here—some 69 percent of the adjudicated value—was not unreasonably low under foreclosure conditions. Instead, the bankruptcy court referring to this testimony concluded that a sheriff's sale inherently can not be the equivalent of "a commercially reasonable sale." In this respect, it took issue with long-settled state law foreclosure procedures as well as economic reality. The Bankruptcy Code does not evince Congressional intent to invalidate every foreclosure sale as "commercially unreasonable" merely because it is involuntary.

The bankruptcy court also stated that the sale did not compare favorably with a typical private sale of residential property in Philadelphia. But the critical question is whether the sale compared favorably to a typical *foreclosure* sale in the area—and the uncontroverted evidence received at the supplemental hearing showed that it did so. In effect, the bankruptcy court dispensed with *Durrett*'s *per se* percentage test but seems to have adopted another, even more stringent, *per se* test.

The Barrett sheriff's sale occurred more than a year and a half ago and its invalidation eight months later set in motion a lengthy process of hearings and appeals. Litigation delays significantly discourage future bidding at foreclosure sales, further demoting distress sale values.[4] Bidders are deterred by the lack of finality and predictability. *See In re Alsop*, 14 B.R. 982, 987 (Bankr.D.Alaska 1981), *affirmed*, 22 B.R. 1017 (D.Alaska 1982). Relief from foreclosure sale under § 548 should be reserved for extraordinary situations where state law and sheriff's office procedures have not been followed, where advertising is extremely limited, or where bidding is suspiciously lacking in competitiveness—and the sale price, as a result, is clearly inadequate.

Considering all the evidence adduced at the supplemental hearing, the foreclosure sale of the debtor's residence is found to have produced not "less than a reasonably equivalent value" under 11 U.S.C. § 548. The decision of the bankruptcy court setting aside the sale as a fraudulent transfer must be reversed.

---

ful bidder, the evidence adduced in this case was sufficient to show that the sheriff's sale did not result in "less than a reasonably equivalent value" for the debtor's real estate.

**4.** The effect has been aggravated in that the real estate market in the past year has become severely depressed.