In re Alfred G. MATTERA, Debtor.

Alfred G. MATTERA, Plaintiff,

v.

Gerald BLUM, Edward Pressman, Dennis Kulp, Michael Haughton, Michael Weiner, Delaware Valley Savings & Loan, and Merrill Seidman, Vice President Delaware Valley Savings & Loan, Defendants.

Bankruptcy No. 90–12156S.
Adv. No. 90–0764S.

United States Bankruptcy Court,
E.D. Pennsylvania.

June 18, 1991.

Henry J. Sommer, Philadelphia, Pa., for debtor.

Michael Weiner, pro se.

Ellen McDowell, Drinker Biddle & Reath, Philadelphia, Pa., for Delaware Valley Sav. & Loan and Seidman.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 Trustee.

Paul Jay Cohen, Philadelphia, Pa., for Blum and Pressman.

Kevin Kologinsky, Philadelphia, Pa., for Kulp and Haughton.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

At issue is a Motion requesting this court to award, jointly and severally, attorney's fees in the total amount of $18,450.50 plus $1,527.26 for costs to Community Legal Services, Inc. ("CLS"), counsel for ALFRED G. MATTERA, the Plaintiff–Debtor ("the Debtor"), against each of three "sets" of defendants in this adversary proceeding arising out of a Chapter 13 bankruptcy case which was settled by Stipulation of the parties. We conclude that only services that are compensable are those which can be fairly allocated to litigation of (1) the Debtor's potentially meritori-

ous statutory fee claim under the federal Truth-in-Lending Act, 15 U.S.C. § 1601, *et seq.* ("the TILA"); and (2) non-fee claims such as the Debtor's claims under 11 U.S.C. § 548(a)(2) ("the 548 Claim"), the services for which are not severable from services performed on the TILA claims. We will not allow compensation for services devoted to litigation of clearly non-meritorious potentially statutory fee claims under the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"), or under the state law prohibiting unfair and deceptive acts and practices, 73 P.S. § 201–1, *et seq.* ("UDAP"). We also hold that fees are chargeable only to parties implicated in the Debtor's TILA Claim and 548 Claim.

After also making several miscellaneous disallowances for, mostly, services too remote from the proceeding to be related to it and inadequately described, we hold that CLS is entitled to an award of fees in the amount of $11,096.00, in addition to the costs of $1,527.26, from only one set of Defendants, GERALD BLUM and EDWARD PRESSMAN ("the B & P Defendants" or "B & P"); and Defendant DELAWARE VALLEY SAVINGS & LOAN ("DVSL"), jointly and severally. We find that these Defendants were fully implicated in the Debtor's TILA Claim, and that the 548 Claim was so pervasively intermingled with the TILA Claim that the services performed on these claims are not severable. However, we conclude that none of the Debtor's viable claims against the third set of Defendants, DENNIS KULP, MICHAEL HAUGHTON, and MICHAEL WEINER ("THE K, H & W Defendants" or "K, H & W"), or Defendant MERRILL SEIDMAN ("Seidman"), the Vice–President of DVSL, are related to the Debtor's TILA Claim. Further, we find that the claims against the K, H & W Defendants were mitigated by the willingness of these parties to settle them on terms acceptable to the Debtor prior to trial. Therefore, the Debtor's Motion is denied entirely as to K, H & W and Seidman.

## B. PROCEDURAL AND FACTUAL HISTORY

The Debtor filed the underlying Chapter 13 case on May 18, 1990. On July 11, 1990, B & P, who purchased the Debtor's home at 3049 Unruh Street, Philadelphia, Pennsylvania ("the Home"), at a sheriff's sale of August 7, 1989, moved for relief from the automatic stay to proceed with a state-court ejectment action against the Debtor. The hearing on this motion was twice continued, by agreement, until October 4, 1990.

Meanwhile, on October 1, 1990, the instant adversary proceeding was initiated by the Debtor against all three sets of Defendants. Six Counts were alleged: (1) the 548 Claim, seeking to set aside the August 7, 1989, sheriff's sale of the Home to B & P on the writ of DVSL; (2) an alternative claim that the judgment underlying the sale was defective, as it was preceded by an errant notice pursuant to 41 P.S. § 403(c); (3) the TILA Claim, in which rescission of the underlying obligation of the Debtor to DVSL was sought; (4) a UDAP claim, apparently against all Defendants for different reasons;[1] (5) a fraud claim, also apparently against all Defendants; and (6) a RICO claim, apparently asserting a single conspiracy of all of the Defendants.

At the close of the hearing on October 4, 1990, we expressed skepticism regarding the merits of the primary contention articulated at that time by the Debtor, *i.e.*, that B & P made the payments on behalf of the Debtor on his obligation to DVSL and that the judgment, execution, and sheriff's sale based upon that judgment by DVSL was a product of a conspiracy between B & P and DVSL/Seidman and therefore a sham. Consequently, we entered an Order of October 5, 1990, pursuant to the Debtor's request, continuing the stay in effect pending the outcome of the adversary proceeding. However, we also expedited the trial of the proceeding to October 22, 1990, in

---

**1.** The Complaint fails to designate any particular Defendants as the specific target of any of the claims. The UDAP claims are set forth in detail in the Debtor's post-trial submissions, as described at pages 114–15 *infra*.

order to avoid any unfair delay to B & P in enforcement of their rights.

At the outset of the trial on October 22, 1990, the Debtor and K, H & W announced that they had agreed to settle the differences among themselves in consideration for a payment from K, H & W to the Debtor of $5,900. However, the B & P Defendants and DVSL/Seidman objected to the dismissal of K, H & W. We were obliged to disapprove the settlement for fear of unfairly jeopardizing the other Defendants or delaying the trial. Therefore, the trial went forward against all of the Defendants.

The underlying facts of the dispute were developed at both the hearing of October 4, 1990, and the trial of October 22, 1990. The Debtor, a single, middle-aged man suffering from lupus, purchased the Home in 1973. In February, 1987, being unable to work because of his illness, the Debtor failed to keep up with his mortgage payments. The mortgagee of the Home then instituted proceedings to foreclose the mortgage, which then had a balance of approximately $13,000. As a result of those proceedings, the Debtor's home was sold at a sheriff's sale on September 14, 1987.

Defendant WEINER ("Weiner") purchased the Home at the sheriff's sale, at which there was active bidding, on behalf of himself and Defendants KULP and HAUGHTON, for a bid of $49,900. Shortly after the sale, Weiner contacted the Debtor and allegedly offered to sell the Home back to him in exchange for his paying off the mortgage balance, all costs, and a fee of $7,500 to K, H & W. Weiner requested a payment of $2,500 prior to closing and rent of $450 for each of the two and a half months until the closing, which the Debtor paid, in part with money borrowed from his sister and partly from his own earnings, as he had returned to work. Allegedly Weiner also stated that, once the sheriff's sale was set aside, the Debtor would receive a refund of Weiner's $4,990 deposit paid to the sheriff. The Debtor testified that he understood that Weiner would arrange for

a new mortgage in the amount of about $25,000, which would cover the prior mortgage balance, all appropriate costs, and the fee of K, H & W.

The Debtor was then contacted by Defendant BLUM ("Blum"), a loan broker acting on behalf of K, H & W, in reference to obtaining the requisite new mortgage. Blum allegedly advised the Debtor that he would obtain a mortgage for him at "conventional rates." He also had the Debtor sign an "agency agreement" with American Mortgage Investment Corporation ("AMIC"). Although the "agency agreement" provided that the Debtor would pay a "consultation fee" of $3,850 to AMIC, the Debtor testified that the amount of the fee was not filled in when he signed the agreement and he was unaware of his liability for same.

On November 14, 1987, the Debtor went to a settlement on the new mortgage loan, which B & P obtained from DVSL. Prior to settlement, he was given a purported TILA disclosure statement by Blum. At settlement, he was given another TILA disclosure statement by DVSL. The Amount Financed, the Finance Charge and the Annual Percentage Rate ("APR") on the two statements differ substantially. A Notice of Right to Rescind was also given to the Debtor at settlement by DVSL. The loan transaction contemplated a pay off of the Debtor's prior mortgage loan, and K, H & W never closed on their bid at the sheriff's sale. The APR on the loan, as disclosed by DVSL,[2] was 16.55 percent.

On September 7, 1990, the Debtor, by his counsel, sent a letter to DVSL & B & P rescinding the transaction of November 14, 1987, pursuant to 15 U.S.C. § 1635 of the TILA. Neither DVSL nor B & P responded to this letter and no rescission was effected.

From the settlement proceeds, a total of $9,827 was paid to K, H & W. Over $4,200 was paid to B & P and AMIC. The Debtor received no funds in the new mortgage loan transaction, the Amount Financed of which was $34,092.61 rather than $25,000.

---

2. The Blum disclosure statement set the APR at 18.548 percent.

After settlement, K, H & W did not remit the sheriff's refund of $4,990 to the Debtor. B & P admitted that they had engaged in many financing transactions in the past with DVSL, and that AMIC was their corporation.

After making the first ten payments to DVSL totaling $5,140,50, the Debtor's illness worsened, he was forced to leave work, and he failed to keep up with the monthly payments to DVSL.

At a deposition prior to the hearing of October 4, 1990, Blum indicated that B & P had guaranteed the payment of the Debtor's mortgage payments to DVSL. This statement caused the Debtor to allege that B & P began making the payments on the mortgage after the Debtor failed to do so. This allegation was denied by B & P and DVSL. At trial Blum testified that, at his deposition, he had merely meant to convey that B & P had a moral obligation to render DVSL harmless from liability in order to preserve the ongoing business relationship between B & P and DVSL.

DVSL ultimately instituted a mortgage foreclosure action against the Debtor, obtained judgment, and again proceeded to have the Home sold at sheriff's sale on August 7, 1989. DVSL purchased the Home on the writ at the sheriff's sale at which time there was no bidding. DVSL then assigned its bid to B & P in consideration for their agreement to pay the balance of the mortgage, plus the costs and attorney's fees actually expended by DVSL. The total of the mortgage principal balance, accrued interest, late charges, actual attorney's fees and costs incurred by DVSL, and taxes due on the Home totalled $41,978.65.

Robert Ludwig ("Ludwig"), the Debtor's well-qualified appraiser,[3] testified that, at the time of the sheriff's sale, the Home was worth at least $67,000. Ludwig also stated that property values in the Home's neighborhood had increased by about 15–20 percent since the sheriff's sale two years earlier, where the property had sold for $49,900. B & P was granted a continuance until November 9, 1990, to adduce testimony from an appraiser who allegedly failed to appear at the trial on October 22, 1990, due to a family medical emergency. However, the appraiser also failed to appear, without cause, at a rescheduled hearing of November 9, 1990. By Order of that date, the record was closed and the parties were given until November 26, 1990 (the Debtor), and December 10, 1990 (the Defendants), to submit Proposed Findings of Fact and Conclusions of Law and Briefs in support of their respective positions in the proceeding.

After receipt of the Debtor's submission, we scheduled a settlement conference in reference to this proceed on December 7, 1990, before the Honorable Judith H. Wizmur of the District of New Jersey, and suspended the briefing in the interim. In late December, 1990, with Judge Wizmur's able assistance, the parties reported that they had settled the proceeding. However, it was not until March 27, 1991, after some prodding by this court, that a Stipulation of settlement finally appeared.

The Stipulation provided that B & P would convey a life estate of the Home to the Debtor, subject to his obligation to pay all taxes, insurance, and utility bills relating to the Home, plus $100 monthly rent to B & P. The Debtor was given an additional right to sell the Home to B & P for $32,000 within the first year after the conveyance of the life estate. Thereafter the $32,000 sale-option price was to be reduced by $1,300 per year. K, H & W also agreed to pay the Debtor $7,500, immediately remitting $4,000, and paying the balance in $500 monthly installments. Expressly left undecided was the Debtor's right to attorney's fees from any of the Defendants, although B & P prudently reserved the right to pay any fees awarded against them in four installments over two years.

CLS, by Henry J. Sommer, Esquire ("Sommer"), filed the instant fee Application on April 9, 1991. Therein, CLS sought fees for Sommer's services from October 2, 1989, the date when the Debtor originally

---

**3.** Ludwig is, in fact, often hired by mortgage lenders as an appraiser to testify in proceedings in our court. *See, e.g., In re Cobb,* 122 B.R. 22, 24 (Bankr.E.D.Pa.1990).

was interviewed as a CLS client. No allocation as to specific claims or parties liable was included as to any of the 65.25 hours of his services which Sommer itemized. Hourly rates of $200, $210, and $220, were requested for services in 1989, 1990, and 1991, respectively. Sommer included a description of his superb qualifications as perhaps the outstanding consumer-law bankruptcy lawyer in the country. Compensation was also sought for 41.3 hours of services performed by a CLS law student intern, Lourdes Fuentes ("Fuentes"), for work on UDAP and RICO issues, at $70/hour. Reimbursement of $1,527.26 was sought for costs for deposition transcripts, witness fees, the services of Ludwig, and duplicating costs ($365). The total sought was $18,787.76.

A hearing on the Motion was conducted on May 21, 1991. Each of the sets of Defendants filed answers or objections to the Motion. DVSL/Seidman contended that they were not liable for any fees because no relief had been provided against them, and that Seidman could not have been found personally liable in any event as to any of the claims.

The K, H & W Defendants pointed out that they could not be implicated in the statutory-fee TILA claims, and that the other fee claims, under UDAP and RICO, lacked merit. They also noted that they had offered settlement terms acceptable to the Debtor prior to trial and that therefore any services performed at or after trial should not be chargeable to them. K, H & W thus contended that, under a proper allocation of charges for compensable services against them, they should be entirely excused from liability for CLS's services.

B & P, meanwhile, argued that the only claim which they had settled upon was the 548 Claim, which was not a fee claim. Sensing their implication in the statutory-fee TILA claim, they alternatively raised specific objections to almost every entry on the Application. Specifically, they objected to, *inter alia*, the inclusion of services prior to the filing of the proceeding in issue and even prior to the bankruptcy filing

itself, and the time spent on non-fee or allegedly non-meritorious claims.

After hearing arguments from counsel on May 21, 1991, we accorded the parties until May 31, 1991 (the Debtor), and June 10, 1991 (the Defendants), to submit Supplemental Briefs addressing the Motion. In its Supplemental Brief, CLS demands an additional $1,210 for arguing and briefing this motion, raising its total demand to $19,997.76. B & P and K, H & W filed relatively short Supplemental Briefs. DVSL/Seidman submitted a lengthy Supplemental Brief which, *inter alia,* attacked the merits of the Debtor's 548 Claim and TILA Claim.

## C. DISCUSSION

### 1. THIS COURT IS OBLIGED TO ALLOCATE LIABILITY FOR FEES AMONG THE VARIOUS CLAIMS AND PARTIES.

The principal authorities relied upon by CLS in its claim that all of the Defendants are liable to it for all of its fees are *Hensley v. Eckerhart,* 461 U.S. 424, 433–40, 103 S.Ct. 1933, 1939–43, 76 L.Ed.2d 40 (1983); and *In re Steinbrecher,* 928 F.2d 397 (3d Cir.1991) (Memorandum Opinion, at 4–7). *Hensley* is quoted and cited in support of the principle that, since the Debtor obtained "excellent results," CLS should recover its entire fee, apparently without, according to CLS, any allocation among claims or parties.

At the May 21, 1991, hearing, CLS articulated a concession that some allocation between at least fee-generating and non-fee-generating claims was possible and appropriate. At that argument, Sommer orally recited a seemingly complex formula for allocation which we could not totally grasp. Therefore, we scheduled the supplemental briefing, principally to allow Sommer to spell out in writing his articulated allocation formula, and for the Defendants to respond thereto.

Unfortunately, in its Supplemental Brief, CLS resorts to arguing principally that such allocation is difficult, inappropriate, and unnecessary in light of *Hensley,* and

that therefore it is entitled to full relief against all of the Defendants.

■ *Hensley* and *Steinbrecher* do address situations where a plaintiff prevails on some, but not all, of the claims raised in a lawsuit. They establish that, if the plaintiff's general results are "excellent," and if the services performed in litigating both successful and unsuccessful claims have a common core of facts and the services relating to each cannot be easily allocated, then the plaintiff should recover a full compensatory fee.

However, these cases do not address the formula to be used by a court in measuring an appropriate award where the services performed related to certain discrete claims, some of which have merit and are fee claims, and others of which either totally lack merit or are not fee claims, *can* be allocated. They also do not discuss the problem of allocation of fees among several party defendants, particularly the dynamics when different claims are made against these different parties, some of which have merit and are fee claims, and some of which lack merit and are not fee claims.

■ The issues relative to allocation in such circumstances were discussed by the Third Circuit Court of Appeals in *Baughman v. Wilson Freight Forwarding Co.,* 583 F.2d 1208, 1214–16 (3d Cir.1978). In that case, the court held that hours devoted to claims lacking merit or arising under laws which do not authorize fee-shifting cannot be compensated. *Id.* at 1214–15, 1215–16. *Accord, Northeast Women's Center v. McMonagle,* 889 F.2d 466, 476 (3d Cir.1989), *cert. denied sub nom. Walton v. Northeast Women's Center,* —— U.S. ——, 110 S.Ct. 1788, 108 L.Ed.2d 790 (1990); *Pawlak v. Greenawalt,* 713 F.2d 972, 979 (3d Cir.1983), *cert. denied sub nom. International Brotherhood of Teamsters, etc. v. Pawlak,* 464 U.S. 1042, 104 S.Ct. 707, 79 L.Ed.2d 172 (1984); and *Hughes v. Repko,* 578 F.2d 483, 487 (3d Cir.1978). With respect to multiple party defendants, *Baughman* concludes that only hours "fairly devoted to the prosecu-

tion of the claim" against a party liable for fees may be assessed against it. 583 F.2d at 1215. *Accord, Rode v. Dellarciprete,* 892 F.2d 1177, 1185 (3d Cir.1990); and *Pawlak, supra,* 713 F.2d at 979.

2. GIVEN THE POSTURE OF THIS CASE, WE ARE ABLE TO MAKE ALLOCATIONS AMONG THE CLAIMS AND PARTIES.

Without wishing to deprecate the considerable benefits achieved BY CLS for a client presenting a difficult factual scenario in this case, we would rate the benefits achieved by CLS for the Debtor as "good," but perhaps something short of "excellent." [4] The Complaint stated causes of action which, if all successful, could have eliminated the entire secured claim of B & P or DVSL against the Debtor. The Debtor's Chapter 13 bankruptcy case would have probably resulted in discharge of any of the Defendants' remaining unsecured claims. Thus, the Debtor could quite conceivably have recovered the Home, for himself *and* his heirs, rent-free. *See* pages 117–18 *infra.* As our discussion at pages 116–18 *infra* indicates, we may well have been receptive to the Debtor's 548 Claim and TILA Claim. In addition, the Debtor asserted claims under UDAP and RICO which, if successful, would have trebled his damages.

■ Because the parties settled the entire proceeding in a package prior to this court's being obliged to make any rulings, we had no occasion to rule on the merits of any of the Debtor's claims. Moreover, the settlement package provided a resolution not directly related to the Debtor's legal claims, and therefore it cannot be said that it constituted a concession by any party to the weakness or strength of any particular legal claim. However, this court had invested considerable effort into research and analysis of the substantive issues presented by the case and had, at its disposal, a 48–page submission on behalf of the Debtor at the time that the case was settled. We therefore had formed quite definite opinions regarding the merits of

---

**4.** *But see* page 117 n. 5 *supra.*

the issues presented by the case, and we believe that it is appropriate to apply our tentative conclusions in deciding the instant Motion.

3.  THE DEBTOR'S CLAIMS UNDER RICO AND UDAP LACK MERIT; THEREFORE, SERVICES ALLOCATED TO THESE CLAIMS ARE NOT COMPENSABLE.

After hearing evidence regarding the transactions at issue at the stay relief motion hearing on October 4, 1990, and again at the trial on October 22, 1990, we advised the Debtor that we were not inclined to accept his hypothesis that B & P and DVSL were involved in a conspiracy whereby B & P made payments to DVSL on the Debtor's account, but DVSL failed to credit these payments as part of a conspiracy to foreclose upon the Home. The Debtor admittedly ceased making payments on the mortgage in 1988. It would hardly have been normal for B & P to pick up these payments on the Debtor's behalf as a "gift" to him. It is likely that B & P made no more than an informal guarantee of the Debtor's obligation to DVSL, as Blum described this arrangement at trial.

There is evidence that DVSL and B & P had a regular business relationship. However, there is no evidence that there was anything improper about this broker-lender relationship, or that anything illegal was done to the Debtor as a consequence of this relationship.

Furthermore, there is no evidence that K, H & W had even so much as a regular business relationship with B & P, or (especially) DVSL. The evidence supported only the conclusion that K, H & W requested B & P, who were mortgage brokers, to obtain a mortgage for the Debtor, and that they did so through DVSL, without any direction from K, H & W as to the choice of the lender. We find absolutely nothing illegal or even sinister about this course of dealing between K, H & W and B & P.

■ We therefore reject the Debtor's vague, unproven allegations that all three sets of Defendants were involved in conspiratorial, concerted action to commit common law fraud or engage in fraudulent conduct within the scope of RICO.

In his post-trial submission, the Debtor was somewhat more specific about his claims that the Defendants committed conduct which violated the "catchall" provision of UDAP, which prohibits any "fraudulent conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201–2(4)(xvii). *See, e.g., In re Smith,* 866 F.2d 576, 581–86 (3d Cir.1989); and *In re Milbourne,* 108 B.R. 522, 533–35 (Bankr.E. D.Pa.1989). Each of the sets of Defendants are accused of a series of separate acts violative of UDAP. K, H & W are charged with misrepresenting the fees which they imposed upon the Debtor to help him save the Home. B & P are said to have promised to have obtained a loan at "conventional rates," but to have delivered to the Debtor a new mortgage loan calling for interest at 16.55 percent. Also, they are charged with surreptitiously tacking excessive commissions onto the loan for their own benefit through AMIC. DVSL/Seidman are apparently attacked under UDAP only because they allegedly concealed the alleged fact that B & P had kept the Debtor's account current, and that DVSL thus illegally foreclosed upon the Home despite the absence of a bona fide default.

We do not believe that any of these courses of conduct, to the extent that we find that the Defendants in fact engaged in such courses of conduct, are characterized by such elements of fraud, unconscionability, or "pervasively unfair conduct" as to bring these courses of conduct within the scope of UDAP. *See Smith, supra,* 866 F.2d at 584; and *Milbourne, supra,* 108 B.R. at 534–35. There is considerable doubt in our mind that the Debtor's assertion, unsupported by any hard evidence, that Weiner misstated the terms of the transfer and/or the amount of his fees, was accurate. Perhaps the payment of a sum to the Debtor suggests an admission of some liability on K, H & W's part. However, the conduct of K, H & W in transferring the Home, for which they had just bid $49,900, back to the Debtor for

about $34,000, was not, on its face, unconscionable to the Debtor. K, H & W had no obligation to transfer the property back to the Debtor for any price, and certainly not for a price less than the value of the Home. This is not a case where a party is bilking a victim for a service worth little or nothing. *Compare In re Fleet,* 95 B.R. 319, 335–36 (E.D.Pa.1989) (charge for worthless "referral" service); and *In re Wernly,* 91 B.R. 702 (Bankr.E.D.Pa.1988) (grossly excessive check-cashing charge). The "service" provided to the Debtor was offering him an accommodation to recover the Home, to which he had otherwise irrevocably lost his valuable rights.

The UDAP claim against B & P, *i.e.,* that the terms of the new mortgage included an excessive rate of interest, is also far from obvious. While an interest rate of 16.55 percent may have been considerably higher than the alleged 10 percent rate for residential mortgages as of November, 1987, it was considerably less than the rates ranging from 23 percent to over 27 percent chargeable by companies licensed under the state Consumer Discount Company Act, 7 P.S. § 6201, *et seq. Compare Milbourne, supra,* 108 B.R. at 526; and *In re Tucker,* 74 B.R. 923, 925, 926 (Bankr. E.D.Pa.1987). Furthermore, it must be recalled that the Debtor's credit rating was severely marred by his recent foreclosure and the presence of an illness which adversely affected his earning capacity. *Compare In re Fricker,* 113 B.R. 856, 868–73 (Bankr.E.D.Pa.1990) (debtors with a fairly good credit record and ample security were charged, allegedly without a full disclosure of same, an interest rate of 9% over prime, placement fees of $7,700, *and* a broker's fee of $12,000). We cannot say that the rate charged, given these circumstances, was more than that which was "conventional."

In order to sustain the Debtor's claim that DVSL violated UDAP, we would be compelled to credit the Debtor's allegation that B & P committed themselves to pay the DVSL mortgage and did so, but that DVSL nevertheless proceeded to foreclose on the Home. As we indicated at page 114 *supra,* we refuse to credit this allegation.

Therefore, we conclude that none of the Debtor's allegations of violations of UDAP, as well as his vague RICO claims, had any merit. Consequently, we conclude that neither the UDAP nor the RICO claims of the Debtor—the only statutory claims other than the Debtor's TILA claims—had a reasonable chance of success. Consequently, the Debtor should not be able to recover any fees for services performed solely in connection with these claims. *Accord, In re St. Mary Hospital,* 97 B.R. 199, 204–06 (Bankr.E.D.Pa.1989), *aff'd,* 120 B.R. 25 (E.D.Pa.1990), *aff'd,* 931 F.2d 51 (3d Cir. 1991).

The only statutory fee claims which the Debtor had against K, H & W were based upon UDAP and RICO. The Debtor clearly had no TILA claim against these parties. Therefore, CLS has no right to recover any portion of its attorney's fees from the K, H & W Defendants.

There is an alternative basis on which we would be inclined to deny or substantially reduce CLS's claims against K, H & W. At the outset of the trial of the adversary proceeding on October 22, 1990, counsel for the Debtor and K, H & W announced that they had reached a mutually-agreeable settlement under the terms of which K, H & W would pay $5,900 to the Debtor in exchange for their dismissal from the lawsuit. This settlement was not consummated only because the other Defendants declined to agree to same. It is true that the co-Defendants had a right to take this position. *See* Bankruptcy Rule 7041 and Federal Rule of Civil Procedure 41(a)(1)(ii). It is also true that K, H & W ultimately agreed to pay the Debtor $7,500, $1,600 more than the $5,900 figure. However, the important consideration is that, on October 22, 1990, prior to trial, the Debtor agreed to accept K, H & W's offer. K, H & W remained in the case thereafter only because of the actions of the other Defendants. Under these circumstances, we believe that it would be patently unfair to attribute any services performed at or after the trial of October 22, 1990, to K, H & W.

Certain of the other services for which CLS seeks compensation can also be eliminated as consequences of our finding that the Debtor's UDAP and RICO claims lack merit. All of the services performed by CLS's law clerk Fuentes addressed only the Debtor's UDAP and RICO claims. Therefore, all of her services, plus Sommer's "talks" with her about her work, must be excised. Also disallowed are those portions of Sommer's itemized services attributable to revisions of the portions of the Debtor's Brief addressing the UDAP and RICO claims.

4. ALL OF THE SERVICES PERFORMED BY THE DEBTOR ON THE APPARENTLY MERITORIOUS AND INTERTWINED TILA FEE CLAIM AND 548 NON–FEE CLAIM ARE COMPENSABLE FROM THE B & P DEFENDANTS AND DVSL.

■ Although we believe that application of *Hensley* cannot save the services performed in connection with the Debtor's UDAP and RICO claims from elimination, we find that *Hensley* does support the conclusion that all of the services performed in connection with the Debtor's 548 Claim, as well as his TILA Claim, are compensable. We believe that the Debtor's strongest claims by far, and those which drove the settlement of this case, were the force of his 548 Claim and TILA Claim working in tandem.

The Debtor's success on his 548 Claim was a necessary condition to reach his "hammer," the TILA claim. For, unless the sheriff's sale of the Home could be set aside, the Debtor's right to rescind the sheriff's sale would be cut off by the sale of the Home. *See* 15 U.S.C. § 1635(f).

DVSL argues vigorously, in its Supplemental Brief, that the decision of the district court in *Barrett v. Commonwealth Federal Savings & Loan Ass'n,* 118 B.R. 255 (E.D.Pa.1990) ("*Barrett II*"), rendered the Debtor's 548 Claim tenuous. *Barrett* held that U.S.C. § 548(a)(2) supports relief from a sheriff's sale only in the "extraordinary situation" where advertising is "ex-

tremely limited" or where bidding which is "suspicious by lacking in competitiveness" results in an inadequate sales price. *Id.* at 258. However, the *Barrett* case was appealed and has been argued before the Third Circuit Court of Appeals. This court, as reflected by its decision in *In re Barrett,* 113 B.R. 175 (Bankr.E.D.Pa.1990) ("*Barrett I*"), *rev'd, Barrett II, supra,* is not supportive of all of the reasoning (or the result) in *Barrett II.* Furthermore, the *Barrett II* court was strongly influenced by the unusually active bidding at the sheriff's sale in issue in that matter. 118 B.R. at 257, 258. Here, the August 7, 1989, sale was characterized by a complete absence of bidding and yielded a lower bid price than the Home had fetched in a sale of September 14, 1987, despite the fact that, per Ludwig, home values rose by 15 to 20 percent during the pertinent time period between September, 1987, and August, 1989. Therefore, even under the reasoning of *Barrett II,* the sheriff's sale of August 7, 1989, may have been avoidable under § 548 of the Bankruptcy Code. At best, the result would be in the balance until *Barrett* was decided by the Court of Appeals. By way of contrast with the position of DVSL, the B & P Defendants conceded that the possibility that this court would set aside the sheriff's sale of August 7, 1989, of the Home caused them to settle.

However, the Debtor's success on his 548 Claim, while it would have resulted in his setting aside the sheriff's sale, would, standing alone, merely have effected the return of the Home to him subject to DVSL's lien for the substantial indebtedness remaining on the loan. *See* 11 U.S.C. § 548(c); and *In re Cole,* 89 B.R. 433 (Bankr.E.D.Pa.1988). However, that lien was subject to attack through the medium of the Debtor's attempt to rescind the DVSL loan under 15 U.S.C. § 1635(a) of the TILA.

The holding of *In re Gassaway,* 28 B.R. 842, 848 (Bankr.N.D.Miss.1983), provides the Debtor's necessary link between the 548 Claim and the TILA Claim. *Gassaway* concludes that the avoidance of a sheriff's sale under the Bankruptcy Code reawakens

a debtor's right to rescind under 15 U.S.C. § 1635(f).

DVSL again alone argues vigorously that, even if the Debtor was authorized to utilize § 1635 of the TILA to avoid the August 7, 1989, sale, he was barred from doing so by 15 U.S.C. § 1635(e)(1)(A), which provides that there is no right to rescind a residential mortgage transaction.[5]

The TILA, at 15 U.S.C. § 1602(w), defines a "residential mortgage transaction" as "a transaction in which a mortgage, ... is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling." It is clear that the financing agreement in issue was not generated in connection with the initial construction of the Debtor's Home. However, a difficult issue is presented as to whether the transaction was to finance the Debtor's "acquisition" of the Home.

DVSL cited authority, *e.g., Heuer v. Forest Hill State Bank,* 728 F.Supp. 1199, 1200–01 (D.Md.1989), and Official Staff Commentary on Regulation Z Truth in Lending, § 226.2(a)(24)6, for the principle that, if any part of loan proceeds are used to finance the acquisition of a dwelling, the loan is exempted from the right to rescind under § 1635(e)(1)(A). It also cites *Stone & Stone Pension Plan v. Alston,* 12 Conn. App. 670, 533 A.2d 898 (1987), in which the loan in question, obtained to pay off the parties from whom the borrowers purchased a mobile home and in whose favor they had executed a "bond for deed," was found to be exempt from rescission under § 1635(e)(1)(A). The *Stone* court held that the purpose of this mortgage transaction was to acquire the property, and that it was not a mere refinancing of the earlier purchase loan.

However, in the instant case, the Debtor had acquired legal title to the Home many years before in 1973. Although the Debtor agreed to pay "rent" for the Home to K, H & W pending settlement on the DVSL loan, it must be recalled that K, H & W never actually became owners of the Home because they never closed on their bid at the sheriff's sale of September 14, 1987. Part of the proceeds of the loan from DVSL were used to pay off the Debtor's initial mortgage. Therefore, it seems clear that the transaction of November 14, 1987, was in the form of a loan, the proceeds of which were used in part to refinance the Debtor's prior mortgage and the remainder of which was used in connection with costs entailed in the refinancing effort. As such, it was not a loan in which the Debtor "acquired" the Home. It was merely a loan through which he "retained" it. Therefore, not even a portion of the loan from DVSL appears to have been used in the "acquisition" of the Home by the Debtor.

*James v. Ragin,* 432 F.Supp. 887 (W.D. N.C.1977), presents facts very similar to the instant case and supports this result. In *James,* a second mortgagee on the plaintiffs' home foreclosed on their property and bought it in a foreclosure proceeding. *Id.* at 890. In attempting to repurchase the property from the mortgagee, the plaintiffs consulted a real estate agent, who agreed to put up money for the repurchase, but did not inform the plaintiffs of their right to rescind his loan. *Id.* at 890. The *James* court held that the real estate agent was obliged to have provided the plaintiffs with a notice of their right to rescind the transaction "[b]ecause the transaction involved the taking of a security interest in real property used as plaintiffs' principal residence." *Id.* at 893. *See also French v.*

---

5. If we believed that DVSL was correct in its contentions that the Debtor's 548 Claim and TILA Claim lacked merit, then we would be inclined to characterize the settlement as not only "excellent," but "miraculous." "Miraculous" results would appear to justify some fee to the "miracle workers." *Cf. In re Greenley Energy Holdings of PA., Inc.,* 102 B.R. 400, 401, 407 (E.D.Pa.1989) (trustee who allegedly performed a "small miracle" was awarded fees of $362,500).

Of course, there were significant contingencies bearing on the outcome of the proceeding, which rendered settlement appropriate. All of the parties and counsel should be proud of their ability to settle this case on terms which have avoided costly appeals that otherwise may have ensued and rendered the sums in issue here a mere pittance by comparison.

*Wilson*, 446 F.Supp. 216, 218–19 (D.R.I. 1978) (transaction to finance a move to a home is not exempt from the rescission requirements of the TILA).

Furthermore, at the time of the transaction, prior to exposure to the hindsight which its counsel has at present, DVSL indicated its own belief that the transaction was rescindable by providing the Debtor with a Notice of the Right to Rescind it.

We therefore conclude that the Debtor stood a good chance of clearing both the 548 Claim hurdle and the hurdle of the possible exemption of this transaction from the scope of § 1635 of the TILA. If both of these hurdles had been cleared, the establishment of the requisite presence of at least one material violation of the TILA in the disclosure statement necessary to justify rescission appears manifest, as statements including inconsistent recitations of such significant items as the Amount Financed, the Finance Charge, and the APR in the transaction were presented to the Debtor. *See* 15 U.S.C. § 1602(u).

The consequences of a TILA rescission to a secured lender have been characterized by us in the past as "disastrous." *In re Brown*, 106 B.R. 852, 861 (Bankr.E.D.Pa. 1989). *See also, e.g., Tucker, supra,* 74 B.R. at 932–34. DVSL's security interest in the Home would have been terminated. *Brown, supra,* 106 B.R. at 862. All finance charges would have been uncollectible. *Id.* A recoupment of $1,000 against any claim of DVSL would have arisen. *Id.* Statutory damages of $1,000 would have been payable to the Debtor for the failure to act on the Debtor's valid rescission, as well as attorney's fees. *Id.* The entire loan balance could have been stricken and the payments made by the Debtor on the loan ordered returned to him. *See Gill v. Mid–Penn Consumer Discount Co.,* 671 F.Supp. 1021, 1026 (E.D.Pa.1987), *aff'd,* 853 F.2d 917 (3d Cir.1988); *In re Gurst,* 79 B.R. 969, 978 (Bankr.E.D.Pa.1987), *appeals dismissed,* 866 F.2d 1410 (3d Cir.1988) and 88 B.R. 57 (E.D.Pa.1988); and *Tucker, supra,* 74 B.R. at 932. Thus, any remaining unsecured claim of DVSL against the Debtor would have been substantially reduced and could have conceivably been eliminated as a result of success on his TILA Claim.

As the foregoing discussion indicates, the 548 Claim and the TILA Claim were symbiotic. Much of the gathering of evidence, preparation for trial, proof of facts at trial, and post-trial briefing of these two issues were intertwined. Therefore, except for those portions of his services which Sommer concedes were devoted exclusively to the 548 Claim, we are disinclined to allocate the time spent on services on these two Claims. In this context, the Debtor's citation of *Hensley* and *Steinbrecher* is entirely appropriate and these cases support an allowance, as an aspect of the Debtor's TILA Claim, of full compensation for all services which are not specifically designated as related to the 548 Claim or the Debtor's other claims or the Debtor's other claims that would not otherwise support a fee demand.

DVSL argues that CLS is not entitled to any recovery against it because no specific relief was provided to the Debtor against it in the Settlement stipulation. It cites the post-*Hensley* decision in *Texas State Teachers Ass'n v. Garland Independent School District,* 489 U.S. 782, 792, 109 S.Ct. 1486, 1493, 103 L.Ed.2d 866 (1989), in its support, insofar as that case holds that "the plaintiff must be able to point to a resolution of the dispute which changes the legal relationship between itself and the defendants" to make a recovery against those particular defendants. In fact, the principal holding of *Texas State* is plaintiff-friendly, *i.e.,* that the plaintiff need not prevail on the "central issue" in a case against a defendant to be awarded fees against that defendant. However, we believe that the result in this proceeding did result in a very real change in the legal relationship between the Debtor and DVSL. After the settlement, the distinct possibility that the loan relationship between the Debtor and DVSL would be reestablished by the Debtor's success in the 548 Claim and reordered by the Debtor's success on the TILA Claim was eliminated by the settlement.

The only factor which insulated DVSL from the direct impact of the Debtor's claims was the "shield" created for it by B & P, which, pursuant to its informal guarantee to hold DVSL harmless, bore the brunt of the impact of the settlement. However, we believe that, if B & P chose to shield DVSL, that was between those parties. B & P may similarly choose to shield DVSL from any liability imposed upon it by our Order deciding this Motion. However, it nevertheless remains a fact that the Debtor's TILA Claim was his "hammer" and that DVSL was the party directly in the path of being "nailed" by this Claim.

The best counter to DVSL's arguments are a comparison of these arguments to those of B & P. B & P argues that it was potentially the target of only the non-fee 548 Claim. This argument overlooks the fact that Blum was the direct source of one of the two inconsistent TILA disclosure statements. However, even if B & P could not possibly have been directly implicated in the Debtor's TILA Claim, three factors would render them liable for all fees awarded. Firstly, B & P were the principal purveyors of the illegal aspects of the transactions in issue. Secondly, the 548 Claim was, for reasons described at pages 116–17 *supra,* a key which unlocked the Pandora's box of the potentially very dangerous TILA Claim. B & P's direct implication in the 548 Claim necessarily exposed them to the TILA Claim. Thirdly, B & P's willingness to expose itself to the consequences of DVSL's potential TILA violations in itself caused them to be involved in the TILA Claim. Surely B & P and DVSL should not both be able to whipsaw the Debtor and avoid liability for the fee-generating TILA Claim, B & P on the ground that DVSL committed the violations, and DVSL on the ground that B & P agreed to be the sole target of the appropriate relief.

█ We therefore conclude that B & P and DVSL are jointly and severally liable for the full award made to CLS on the Motion. We do agree that Seidman is not liable for any award. The TILA exposes only a "creditor" to liability. 15 U.S.C. § 1640(a). DVSL was the "creditor" in the November 14, 1987, loan transaction, not Seidman. Therefore, Seidman is not personally liable for the TILA violations of DVSL, irrespective of his degree of control over DVSL. The Debtor's articulated claims against Seidman do not appear to lie under the TILA, but to arise from the Debtor's UDAP and RICO claims. We have already concluded that those claims have no merit and cannot serve as the basis for a fee award against parties such as K, H & W, which were potentially liable for only such claims. See pages 19–20 *supra.* Hence, they cannot serve as a basis for any claim of the Debtor against Seidman, either.

5. DISALLOWANCES WILL ALSO BE MADE FOR SERVICES ONLY REMOTELY RELATED TO THE PROCEEDING AND NOT DESCRIBED WITH REQUISITE PRECISION IN CLS'S APPLICATION.

In addition to raising general objections to CLS's claim against it, B & P, recognizing its potential for significant liability, raised specific objections to practically all of the services itemized by CLS and with Sommer's asserted hourly rate.

█ We cannot agree with the criticism of Sommer's hourly rate. His credentials are not only impeccable, but are unique. Consequently, he is entitled to rates which extend to the highest range allowable by this court, presently generally $230/hour. Instructively, B & P does not argue that Sommer is not generally worth the rates requested, but, rather, contends that this case did not merit attention from an attorney of such high calibre. However, we find that this matter did, in fact, present difficult legal issues, and that Sommer's abilities were not wasted on tackling them. We agree with Sommer's observations that (1) his vast experience reduced his time input; and (2) his working alone on the case, except for the assistance of Fuentes, saved the time wasted in a senior staff member's attempts at unification of the services of professionals who divide tasks

and who often engage in endless conferences among themselves.

■ However, some of B & P's specific objections to Sommer's time entries do have merit. We agree that services which pre-dated the bankruptcy case and were rendered in connection with earlier matters in this case had little, if any, relationship to this proceeding, which was not itself filed until after the case was five months old. The time-savings in avoiding repetition of services already provided, such as interviews of the Debtor, was minimal in view of the lengthy time-lapse between the pre-filing services and the filing of the proceeding in issue. All pre-filing services will therefore be stricken.

■ Also, in several instances the descriptions of services performed in the Application are totally inadequate, as they fail to divulge even the general subject matter of letters, phone calls, or discussions with colleagues. The time sought for such poorly-described services must be disallowed. *See, e.g., In re Meade Land & Development Co.*, 527 F.2d 280, 283–84 (3d Cir. 1975); *In re Cascade Oil Co.*, 126 B.R. 99, 105 (D.Kan.1991); *In re Navis Realty, Inc.*, 126 B.R. 137, 141–42 (Bankr.E.D.N.Y.1991); *In re St. Joseph's Hospital*, 102 B.R. 416, 418 (Bankr.E.D.Pa.1989); and *In re Amatex Corp.*, 70 B.R. 624, 627–28 (Bankr.E.D. Pa.1985).

Finally, we have made a few modest deductions for "travel" time, entries for which are lumped together with other services. *See, e.g., In re Montgomery Drilling Co.*, 121 B.R. 32, 43 (Bankr.E.D.Cal. 1990); *In re Taylor*, 66 B.R. 390, 397 (Bankr.W.D.Pa.1986); and *Amatex Corp., supra*, 70 B.R. at 627 (travel allowed at

half-time or reduced rates); and *St. Joseph, supra*, 102 B.R. at 418; *In re Metro Transportation Co.*, 78 B.R. 416, 418 (Bankr.E. D.Pa.1987), *aff'd in part & remanded in part*, 107 B.R. 50 (E.D.Pa.1989); and *Amatex Corp., supra*, 70 B.R. at 624–24 ("lumping" disapproved).

Attached hereto as Appendix "A" is a copy of the Schedule of Time Expended included with CLS's Motion, with notations for all disallowances. We have disallowed 18.05 hours for which Sommer sought compensation. This includes all of his 1989 fees of $690.00 and $3,055.50 on account of 14.55 of his 1990 hours, or $3,735.50 from this total compensation requested in CLS's Application of $13,687.50, leaving a net allowance of $9,952.00. We have stricken all of the $2,891.00 requested for Fuentes' services. We will allow $1,144 for Sommer's additional services in arguing and briefing the instant motion, deducting from the $1,210 sought only .3 hours, or $66, for travel. Since practically all of the compensation sought in the Motion was opposed by all of the Defendants, this additional outlay of time was indeed necessary and reasonable. The total sum allowed as compensation for services is therefore $9,952 plus $1,144, or $11,096.00.

We are not prepared to disallow any of the costs for which reimbursement has been requested, which amount to $1,527.26.

## D. CONCLUSION

All of the disallowances described herein result in an award to CLS of $11,096.00 on account of compensation for services, and $1,527.26 on account of reimbursement for costs, against the B & P Defendants and DVSL only. An appropriate Order follows.

## APPENDIX A
### SCHEDULE OF TIME EXPENDED
#### Henry J. Sommer

| Date | | Hours |
|------|------|-------|
| **1989** | | |
| 10/24/89 | Initial Interview (Eric Frank) | .5 |
| 11/13/89 | Client interview | .7 |
| | Preliminary Objections and IFP | .4 |

| Date | Description | Hours |
|------|-------------|-------|
| 11/15 | Review papers | 1.1 |
| 12/4 | Preliminary Objections to Amended Complaint | .3 |
| 12/6 | Telephone call to Paul J. Cohen re amending complaint and getting documents | .1 |
| 12/11 | Preliminary Objections to amended complaint | .2 |
| 12/18 | Letter to Cohen re documents to be provided | .1 |
| | Total 1989 | 3.4 |

1990

| Date | Description | Hours |
|------|-------------|-------|
| 1/5/90 | Telephone call Cohen re documents | .3 |
| 1/16 | Letter to client re need for information | .1 |
| 1/24 | Client interview re facts of settlement | .4 |
| | Letter to Cophen re discrepancies in numbers | .1 |
| 2/21 | Letter to Cohen re facts | .1 |
| 3/8 | Letter to client re need to discuss strategy | .1 |
| 3/13 | Telephone call to client re strategy | .1 |
| 3/15 | Client interview | .3 |
| | Answer and New Matter | .3 |
| 3/19 | Request for Production | .3 |

*Disallowed too remote*

| Date | Description | Hours |
|------|-------------|-------|
| 4/10 | Letter to client re status | .1 |
| 4/25 | Review P.O's to Answer and Answer to P.O's | .5 |
| 5/17 | Client interview re bankruptcy filing | .2 |
| 6/15 | Letter and stipulation to Cohen re vacating judgment | .1 |

*Disallowed too remote*

*— 6.3*

| Date | Description | Hours |
|------|-------------|-------|
| 7/9 | Letter to client | .1 ✓ too vague |
| 7/24 | Telephone call Cohen re continuance, depositions | .1 |
| 7/30 | Prepare for deposition of Gerald Blum | .1 |
| 7/31 | Deposition of Gerald Blum | 1.5 |
| | Discuss with Eric L. Frank | .5 ✓ too vague |

*6 4*

*6.9*

| Date | Description | Hours |
|------|-------------|-------|
| 8/2 | Client interview re facts of deposition | .4 |
| | Subpoenas, letter to Cohen, deposition notices | .2 |
| 8/21 | Prepare for deposition | .4 |
| | Deposition of Michael Weiner, Dennis Kulp | 1.5 |
| 9/6 | Telephone call to client regarding facts and hearing | .3 |
| | Complaint | 2.5 |

| | | |
|---|---|---|
| 9/7 | Complaint | 1.5 |
| | Telephone call Cohen re hearing | .2 |
| 9/10 | Telephone call client re hearing postponement | .1 |
| 10/1/90 | Answer to stay motion | .1 |
| | Revise complaint | .2 |
| 10/4 | Prepare for hearing | .6 |
| | Stay hearing | 4.7 |
| | Motion for expedited discovery | .3 |
| 10/9 | Motion for expedited discovery hearing and travel | 3.0 −.3 for tra |
| | | 7.2 |
| 10/10 | Telephone call Kevin Kologinsky re Kulp et al. | .3 |
| | Prepare for depositions | 1.7 |
| 10/11 | Prepare for depositions | .7 |
| 10/13 | Telephone call Warren Pratt | .1 ✓ too vag.. |
| | Telephone call to Bob Ludwig | .2 ✓ 7.5 |
| 10/15 | Telephone call Kulp, Kologinsky re | |
| | possible settlement | .3 |
| | Telephone call client re trial preparation | .2 |
| | Assemble documents for trial | .3 |
| | Telephone call Bob Ludwig re appraisal report, | |
| | testimony | .2 |
| 10/16 | Go to sheriff's office | .4 |
| | Interview Bussilo | .1 |
| 10/17 | Prepare client for trial | 1.2 |
| | Prepare for trial | 1.8 |
| | Telephone call Kulp | .3 ✓ too |
| | Telephone call Kologinsky's office | .1 ✓ vague |
| | | 7.9 |
| 10/21 | Prepare for trial | 3.2 |
| 10/22 | Travel and trial | 6.7 −.3 travel |
| | Letter with deposition pages | .1 8.2 |
| 10/30 | Letter to Ellen McDowell re Exhibit P-1 | .1 |
| | Go over claims with Lourdes Fuentes | .8 ✓ UDAP/R* |
| | Telephone call McDowell re settlement | .2 9.0 |
| 11/5 | Telephone call to McDowell to return call | |
| | re offer | .1 |
| 11/7 | Telephone call client re trial, settlement | |
| | offer | .3 |
| | Telephone call McDowell re counteroffer | .2 |
| | Go over case with Lourdes Fuentes | .2 ✓UDAP/RI |
| | Begin preparation for trial | .3 9.2 |
| 11/8 | Telephone call client re trial cancellation, | |
| | counteroffer | .2 |
| | Telephone call McDowell re counteroffer | .1 |
| | Telephone call to court re trial cancellation | .1 |
| 11/13 | Telephone call McDowell re settlement | .1 |
| 11/15 | Discuss brief with Lourdes Fuentes | .3 ✓ U DAP/RICC |
| | Proposed findings of fact | 2.0 |
| 11/16 | Discuss brief with L. Fuentes | .4 ✓ UDAP/RIC |
| | § 548 portion of brief | 2.2 ✓ not comp. |
| | | 12.1 |
| 11/17 | Read L. Fuentes brief | .9 ✓UDAP/RICA |
| | Listen to part of tapes | .4 13.0 |

| | | |
|---|---|---|
| 11/19 | TILA part of brief | 3.2 |
| | Talk to L. Fuentes re her section of brief | .4 |
| 11/20 | Work on findings of fact | .6 |
| | Work on findings of fact | 1.2 |
| 11/21 | Revise UDAP and RICO | .9 |
| | Revise UDAP and RICO parts | 3.2 |
| | Proposed conclusions of law | .8 |
| | Revise § 548 | .25 |
| | Revise TILA, findings of fact | .3 |
| 12/3 | Telephone call Cohen re settlement offer | .1 |
| | Telephone call Kologinsky office re deposition transcripts | .1 |
| 12/4 | Telephone call client re settlement conference; Cohen offer | .2 |
| 12/5 | Telephone call client re settlement conference | .1 |
| | Telephone call McDowell re settlement | .1 |
| | Travel and conference | 3.0 |
| 12/12 | Telephone call Cohen re settlement | .2 |
| | Telephone call client re settlement authority | .1 |
| | Telephone call Cohen re settlement | .2 |
| 12/13 | Telephone call Kologinsky re settlement | .2 |
| 2/14 | Letters confirming settlement and telephone call to Pam Doll | .1 |
| | Telephone call client re settlement | .1 |
| | Telephone call Cohen re settlement | .1 |
| | Telephone call Kologinsky re settlement | .1 |
| | Telephone call Kologinsky re settlement | .1 |
| | Telephone call Kologinsky re settlement | .1 |
| 12/18 | Telephone call Cohen to tell him settled with Kulp et al. | .1 |
| | Letter to Kologinsky re his Fax | .1 |
| | Telephone call Kologinsky office re his Fax | .1 |
| | Total 1990 | 59.95 |

**1991**

| | | |
|---|---|---|
| 1/3/91 | Draft stipulation | .9 |
| | Discuss stipulation with Eric Frank | .1 |
| | Revise stipulation | .1 |
| | Letter enclosing stipulation | .1 |
| | Total 1991 | 1.2 |

Attorney's Fees

| | | |
|---|---|---|
| 12/7 | Compile hours | .3 |
| 12/10 | Telephone call McDowell re cite to NJ Sup. Ct. fees case | .1 |
| 1/9/91 | Letter to Cohen and Kologinsky re fees and hours | .2 |
| 4/8/91 | Attorney's Fees Motion and Memorandum | 2.5 |
| | | 3.1 |
| | TOTAL TIME | 65.25 |

*[Handwritten margin notes: beside 11/19 "UDAP/RICO 13.4"; beside 11/21 "UDAP/RICO 17.5", "548", "17.75"; beside Travel and conference "-.3 tran. 18.05"]*

**124**

SCHEDULE OF TIME EXPENDED

Lourdes Fuentes

Date

1990

| Date | | Hours |
|------|------|------|
| 10/30/90 | Discuss necessary tasks with Henry Sommer | .8 |
| 11/7 | Go over case with Henry Sommer, begin review of documents | .5 |
| 11/8 | Review documents | 3.0 |
| 11/9 | Initial UDAP research | 4.0 |
| 11/13 | Listen to tapes and prepare digest | 3.0 |
| 11/14 | UDAP research | 10.0 |
| 11/15 | UDAP section of brief | 10.0 |
| 11/16 | RICO section of brief | 8.0 |
| 11/20 | Revise RICO section of brief | 2.0 |
| | TOTAL HOURS | 41.3 |

UDAP/ RICO ✕

Mattera Costs

| | |
|------|------|
| Deposition of Dennis Kulp, Michael Weiner | $ 161.95 |
| Deposition of Gerald Blum | 145.01 |
| Deposition of Edward Pressman, Merrill Seidman | 164.30 |
| Appraisal | 300.00 |
| Testimony of appraiser | 250.00 |
| Tapes of Trial | 45.00 |
| Weiner witness fee | 32.00 |
| Kulp witness fee | 32.00 |
| Bogle witness fee | 32.00 |
| Photocopy - approximately 365 pp x 5 copies/page = 1825 x .20 = | 365.00 |
| Total costs | $1,527.26 |